**Donald R. SADLER, Plaintiff and Appellant,**

v.

**BASIN ELECTRIC POWER COOPERATIVE, Defendant and Appellee.**

Civ. No. 880105.

Supreme Court of North Dakota.

Nov. 8, 1988.

Dietz & Little, Bismarck, for plaintiff and appellant; argued by Stephen D. Little. Appearance by Kathryn L. Dietz.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for defendant and appellee; argued by Warren H. Albrecht. Appearance by Daniel L. Hovland.

ERICKSTAD, Chief Justice.

Donald Sadler (Sadler) brought a claim for wrongful discharge against Basin Electric Power Cooperative (Basin). The district court granted summary judgment in favor of Basin and Sadler appealed. We affirmed in part, reversed in part and remanded. *Sadler v. Basin Electric Co-op.*, 409 N.W.2d 87 (N.D.1987) (*Sadler 1*). At the subsequent trial, the jury returned a verdict in favor of Basin. Sadler now appeals from the judgment based on this verdict. We affirm.

Sadler worked at Basin from April 1, 1976, until he was discharged by letter dated October 15, 1985, stating that "your position is being eliminated due to the restructuring and reorganization of the Cooperative." Sadler asserts that when he was hired in 1976, his supervisor assured him that there was "a very good future with Basin Electric as long as you did a good job." Sadler interpreted this representation to mean that he could not be fired without a just cause, meaning employee misconduct. Basin does not dispute that Sadler could be discharged only for cause, however, Basin's interpretation of "just cause" includes layoffs or reductions-in-force.

One method by which Basin communicated with its employees was through employee handbooks which were periodically updated. Sadler recalled receiving an employee handbook for the first time in 1980. Among other things, that handbook stated that "[p]ermanent employees cannot be terminated without a just cause." Sadler received an updated employee handbook in 1982 with a similar "just cause" provision. "Just cause" was not defined in the 1980 or 1982 employee handbooks. In 1983, Sadler received another employee handbook, which included, for the first time, a definition of "just cause" referring to insubordination, theft, etcetera, but making no reference to layoffs.[1] The 1983 handbook, for the first time, also contained a contractual disclaimer and a reservation of the right to modify the terms of the handbook. In 1985,[2] Sadler received another employee handbook which contained, for the first time, a reduction-in-force policy. It also changed the dismissal-for-cause provision to include "[e]limination of a position due to lack of work or a continued need for the position" as a cause for discharge.

On his first appeal, Sadler asserted that the "just cause" provision in the 1980 employee handbook meant employee misconduct and did not extend to layoffs due to job reduction and that Basin could not subsequently change the "cause" provision and make it applicable to him. We stated:

"We are unable to ascertain the parties' intentions from the employee handbooks alone. Upon considering the pleadings and evidence in the light most favorable to Sadler, it appears to us that Sadler has raised genuine issues of material fact regarding whether or not subsequent changes in the employee handbooks were intended to apply to existing employees at the time they were issued and, if they were, regarding the intended meaning of the term 'just cause' in the 1980 employee handbook. Thus there are questions of fact to be determined by the trier of fact. [Cite omitted.] Those genuine issues of material fact preclude disposition of Sadler's cause of action for breach of his employment contract by summary judgment. [Cite omitted.]" *Sadler 1,* 409 N.W.2d at 89.

Counsel for Sadler interprets our directions on remand rather broadly and argues that:

"[T]his Court must necessarily have concluded that: Sadler had an employment contract with Basin; the terms of that contract regarding job security were embodied in the 1980 Employee Handbook; the meaning of the term 'just cause' in the 1980 Employee Handbook is ambiguous and can only be determined by looking at the intent of the contracting parties; whether subsequent changes in the 1980 job security provision were applicable to Sadler depends again on the intent of the contracting parties."

Our view is that we remanded the case for a determination of material facts concerning whether or not subsequent changes in the employee handbook were

---

1. The section entitled "Disciplinary Action and Dismissal," reads in pertinent part:

"Basin Electric's policy on disciplinary action provides that employees of the Cooperative may be disciplined for incompetence, tardiness, insubordination, unjustified absence, sick leave abuse, safety violations, or similar breach of Cooperative policies and practices.

"... The employee may be discharged following a third offense.

"Basin Electric reserves the right to dismiss an employee at any time with cause. Theft from the Cooperative, sale or use of alcohol or drugs during working hours, assault or harassment of another person on the job, destruction of Cooperative property, unauthorized use or falsification of records, or disclosure of confidential information will result in dismissal unless there are extenuating circumstances."

2. While no reference is made in the record as to the exact date Sadler reviewed the 1985 handbook, we surmise that it was early in the year based on the following testimony by Sadler:

"Q. Did you receive any more job offers?

"A. Yes. In the spring of 1985 I received a job offer to go to work for or on the construction of a high voltage transmission line from Sheridan, Wyoming, to somewhere in New Mexico.

"Q. Do you recall whether that was before or after you received the 1985 handbook?

"A. To my recollection, I can't say, but I think it was after I received the handbook, because this was in February or March then I received that."

intended to apply to existing employees at the time they were issued and, if applicable, the meaning of the term "just cause" in the 1980 handbook. Arguably, the meaning of the term "just cause" in the 1980 employee handbook would not be determinative of this lawsuit if the changes are applicable to the employees, particularly those who continue in employment after the changes are made with knowledge and without objection. Significant is what the Supreme Court of Minnesota has said relative to this issue in *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983):

"In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's re-tention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." *Pine River*, 333 N.W.2d at 627, citing *Stream v. Continental Machines, Inc.*, 261 Minn. 289, 293, 111 N.W.2d 785, 788 (1961).

The facts when considered in the light most favorable to the verdict indicate that these were the circumstances in this case.[3]

Sadler raises numerous issues on this appeal, contending primarily that:

(1) Sadler had a contract of employment with Basin which required just cause for termination, a term intended by the parties to be limited to misconduct or inefficiency; and

(2) the district court erred in giving the jury instructions.[4]

---

**3.** Sadler testified:

"Q. All right. Don, were you aware when you worked for Basin of employees being laid off prior to 1985?

"A. Was I? Was I aware of the employees being laid off prior to 1985? Was that the question?

"Q. Yes.

"A. Yes, I was aware of some employees were laid off."

Sadler later testified:

"Q. In the fall of 1983, there were discussions about your position being eliminated as materials construction supervisor?

"A. We were told there was a possibility it could be eliminated.

"Q. The position you were holding in the fall of 1983 was going to be eliminated with the wind-down in construction activity?

"A. The word to me was it was a possibility. It was not a definite yes or a definite no.

"Q. As a result of that, however, the new position was created for you in the fall of 1983; isn't that correct?

"A. Well, I did not understand that it was created for me. I understood there was going to be a position of transmission materials supervisor, located at the Mandan warehouse, yes.

"Q. There wasn't a position like that before you took over that position, was there?

"A. Not at that time, yes, . . . . "

Sadler later testified:

"Q. And I presume that you read the manual when you received it?

"A. Like I said, I read it, but I didn't study it.

"Q. You accepted the benefits that were afforded to you as they were set out in the manual?

"A. I accepted the benefits like everyone else did.

"Q. As far as additions and revisions made to the manual from 1980 to 1985, you read these revisions that were handed out to you?

"A. In the course of my employment, I am sure I read them, but, like I say, I did not sit down and study it."

Sadler later testified:

"Q. You continued to work at Basin Electric, knowing the modifications that had been made in the manual over the years?

"A. Yes, sir."

**4.** Sadler states the issues as follows:

"A. IS THE EMPLOYMENT CONTRACT BETWEEN DONALD R. SADLER AND BASIN ELECTRIC POWER COOPERATIVE SUBJECT TO THE SAME RULES OF CONSTRUCTION AND INTERPRETATION AS OTHER CONTRACTS, AND THUS, WAS SADLER, IN AN ACTION FOR BREACH OF HIS EMPLOYMENT CONTRACT, ENTITLED TO JURY INSTRUCTIONS UTILIZED IN OTHER BREACH OF CONTRACT ACTIONS?

"1. DID SADLER HAVE A CONTRACT OF EMPLOYMENT WITH BASIN WHICH REQUIRED JUST CAUSE FOR TERMINATION, A TERM INTENDED BY THE PARTIES TO BE LIMITED TO MISCONDUCT OR INEFFICIENCY?

"2. DID THE DISTRICT COURT ERR IN DENYING SADLER'S MOTION FOR A DIRECT VERDICT?

■ Sadler claims that the evidence adduced at trial is conclusive regarding the intended meaning of "just cause" both in 1976 when he was hired and in the 1980 employee handbook. Sadler testified that he understood "just cause" to mean "conditions like drinking on the job, insubordination, dereliction of duties, and so forth." James L. Grahl, the now retired General Manager of Basin, testified that his intended meaning of "termination" as used in the 1980 employee handbook was to "tell employees that they would not be terminated for frivolous or insubstantial reasons, that they would not be terminated unless there were substantial misconduct or lack of performance or breach of faith." The very next question to Mr. Grahl, and his answer, follows:

"Q Was that just cause provision in the 1980 handbook intended to include elimination of a position due to lack of work or continued need for the position?

"A Well, that was not in my mind when this was put in. It was really to—really directed at personal conduct of the employee, but it was not meant to rule out termination because of lack of work or reductions in force."

The jury may very well have placed emphasis on the latter part of that answer while Sadler prefers to place emphasis on the former. On cross-examination, Mr. Grahl further testified:

"Q Now, you talked with Mr. Little [counsel for Sadler] about your understanding of—about the personnel policies

in 1980 and your understanding of the term 'just cause.'

"A Yes.

"Q When you were discussing what you felt the term 'just cause' included, were you talking about what you were personally thinking about at that time as to the meaning of these terms?

"A Yes.

"Q Is it true that you were not—in the late '70s and 1980, you were not really thinking about substantial layoffs?

"A That is correct.

"Q Did layoffs occur, however, while the term 'just cause' remained in the policy handbook?

"A Yes.[5]

"Q And did you, as general manager, believe that these layoffs were allowed under your policies?

"A Well, under the general policies of the cooperative?

"Q Yes.

"A Yes.

"Q Okay. Was just cause—the just cause requirement—intended in any way to rule out layoffs?

"A Well, it was not intended to rule out layoffs due to reduction in force or, say, to disappearance of position. What it was intended to do was to prevent a person [from] being fired for inadequate or insubstantial or frivolous reasons.

"Q And did these layoffs that actually did occur while you were general manager affect employees to whom this handbook applied?

"3. DID THE DISTRICT COURT ERR IN REFUSING TO GRANT SADLER'S REQUESTED JURY INSTRUCTIONS ON AMBIGUITY?
"4. DID THE DISTRICT COURT ERR IN REFUSING TO GRANT SADLER'S REQUESTED JURY INSTRUCTION ON CONTRACT MODIFICATION?
"5. DID THE DISTRICT COURT ERR IN ITS INSTRUCTION TO THE JURY AS TO UNILATERAL CONTRACT?
"6. DID THE DISTRICT COURT ERR IN ITS INSTRUCTION TO THE JURY AS TO EMPLOYMENT AT WILL?
"7. DID THE DISTRICT COURT ERR IN REFUSING TO GRANT SADLER'S REQUESTED JURY INSTRUCTIONS ON LIMITING THE DUTY TO MITIGATE DAMAGES?
"8. DID THE DISTRICT COURT ERR IN ASKING THE JURY WHETHER MODIFICA-

TIONS TO BASIN'S EMPLOYEE HANDBOOK WERE APPLICABLE TO SADLER?"

5. Defendant's Exhibit #32 is as follows:

"1981–1985

"The number of employees Basin Electric terminated for reason related to lack of work or the elimination of a position.

| Year | Regular Employees | Temporary Employees | Positions Not Filled |
|------|-------------------|---------------------|----------------------|
| 1981 | 12 | 21 | N/A |
| 1982 | 21 | 27 | N/A |
| 1983 | 21 | 31 | N/A |
| 1984 | 10 | 9 | N/A |
| 1985 | 224 | 18 | 36" |

"A Yes.

"Q As you have already stated, the cooperative retained the right to make additions and revisions to these or to this handbook?

"A Yes.

"Q Were these changes intended to apply to all administrative employees, even those hired before the changes were made?

"A Yes."

On appeal from a judgment on a verdict, this Court will not invade the province of the jury to weigh evidence or to determine the credibility of witnesses. *Matter of Estate of Knudsen*, 342 N.W.2d 387 (N.D. 1984). In reviewing the evidence, we view it in the light most favorable to the verdict and if there is substantial evidence to support the verdict, we will not set it aside. *Knudsen*, 342 N.W.2d 392. We find that there is substantial evidence in the record to support the jury's verdict.

■ At the close of submission of the evidence, the jury was given instructions concerning, among other things, the function of pleadings, the burden of proof, employment at will, unilateral contracts, handbook provisions, intent, and the elements of proof. Several of Sadler's issues on appeal arise out of these instructions, either the wording of the instructions given, or the fact that certain instructions were given at all. However, a trial court need not give instructions in the specific language requested by a litigant. Instructions which fairly inform the jury of the applicable law are all that is required. *Knudsen*, 342 N.W.2d at 392. This Court has held that no error in either the admission or exclusion of evidence and no error or defect in any ruling or in anything done or omitted by the court or by any of the parties is ground for setting aside a verdict "unless refusal to take such action appears to the court to be inconsistent with substantial justice." *Id.*

■ We consider the instruction on unilateral contracts to be most crucial. The instruction given which was objected to and which is asserted by Sadler to have been error, reads in pertinent part:

"Unilateral contract modification of the employment contract may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify handbook provisions.

"In the case of a unilateral contract for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation and in that manner, an original employment contract may be modified or replaced by a subsequent unilateral contract."

We find the following language in *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984), to be persuasive:

"When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule." *See e.g., Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983).

We have reviewed this instruction, along with the rest given, and those requested and not given, and find no error which affords grounds for setting aside the verdict.

In order to allow the jury to address the issues on remand as set forth in *Sadler 1*, the jurors were given a special verdict form on which to indicate their answers to sever-

al specific questions.[6] Sadler objects to the content of the first question in the special verdict form which asks: "Were the modifications and revisions to the Basin Employee's Handbook made from 1980–1985 regarding reasons for termination of employment applicable to Donald Salder?"

■ Submission of special verdicts is governed by Rule 49(a), N.D.R.Civ.P. The trial court has broad discretion over the nature and scope of written questions submitted to the jury, and appellate review is limited to determining whether or not there was an abuse of discretion. *Victory Park Apartments, Inc. v. Axelson,* 367 N.W.2d 155 (N.D.1985). We remanded to allow the jury to determine "whether or not subsequent changes in the employee handbooks were intended to apply to existing employees at the time they were issued." *Sadler 1,* 409 N.W.2d at 89. We find that the district court's phrasing adequately relays the question to the jury and find no abuse of discretion.

For the reasons stated herein, we affirm the judgment of the district court based upon the jury verdict in favor of Basin.

GIERKE and VANDE WALLE, JJ., concur.

LEVINE and MESCHKE, JJ., concur in the result.

---

**6.** The special verdict form in pertinent part as answered by the jury follows:

"We, the Jury, for our Special Verdict, answer the questions set forth herein in accordance with the instructions given us and find by the greater weight of the evidence:

"QUESTION NO. 1: Were the modifications and revisions to the Basin Employee's Handbook made from 1980–1985 regarding reasons for termination of employment applicable to Donald Sadler?
YES X    NO ___

"QUESTION NO. 2: Was Mr. Sadler terminated from his position for 'just cause'?
YES X    NO ___

"QUESTION NO. 3: Did Basin Electric follow its handbook procedures for reduction in force when it terminated Mr. Sadler?
YES X    NO ___

"(If answers to both questions 2 and 3 are yes, sign and return your verdict. If either answer is no, answer Question 4.)

"QUESTION NO. 4: Did Donald Sadler sustain any damages as a result of his termination from Basin?
YES ___    NO ___

"(If answer is yes, answer Question # 4, if no, sign and return.)

"QUESTION NO. 5: What amount of damages were sustained by Donald Sadler?
$_____.

"Dated: January 28, 1988
/s/_____
FOREMAN OF THE JURY"