[No. S074296. June 1, 2000.]

CRAIG ASMUS et al., Plaintiffs and Respondents, v.
PACIFIC BELL et al., Defendants and Appellants.

**COUNSEL**

Pacific Telesis Legal Group, Mary Lu Christie, Theresa C. O'Loughlin and Elena E. Matsis for Defendants and Appellants.

Paul, Hastings, Janofsky & Walker, Robert F. Walker, Nancy L. Abell and Linda M. Edwards for California Employment Law Council as Amicus Curiae on behalf of Defendants and Appellants.

Hoffman & Lazear, H. Tim Hoffman, Arthur Lazear; Thierman Law Firm, Mark R. Thierman and Carrie L. Freestone for Plaintiffs and Respondents.

**OPINION**

**CHIN, J.**—We granted the request of the United States Court of Appeals for the Ninth Circuit for an answer to the following certified question of law under rule 29.5 of the California Rules of Court:[1] "Once an employer's unilaterally adopted policy—which requires employees to be retained so

[1]All further references to rules are to the California Rules of Court unless otherwise indicated.

long as a specified condition does not occur—has become a part of the employment contract, may the employer thereafter unilaterally [terminate][2] the policy, even though the specified condition has not occurred?" We conclude the answer to the certified question is yes. An employer may unilaterally terminate a policy that contains a specified condition, if the condition is one of indefinite duration, and the employer effects the change after a reasonable time, on reasonable notice, and without interfering with the employees' vested benefits.

## I. BACKGROUND

### A. *Certification*

Rule 29.5(a) provides that we may answer questions of law certified to us by a federal court of appeal (or the court of last resort of any state), provided the certifying court requests the answer, the question may be determinative of a cause pending in the certifying court, and the decisions of the California Courts of Appeal or this court provide no controlling precedent concerning the certified question. Rule 29.5(b) sets forth the required contents of a certification request. Rule 29.5(c) requires the certifying court to furnish this court with relevant briefs and other materials.

Rule 29.5(f) states: "The California Supreme Court shall have discretion to accept or deny the request for an answer to the certified question of law. In exercising its discretion the court may consider: [¶] (1) factors that it ordinarily considers in deciding whether to grant review of a decision of a California Court of Appeal or to issue an alternative writ or other order in an original matter; [¶] (2) comity, and whether answering the question will facilitate the certifying court's functioning or help terminate existing litigation; [¶] (3) the extent to which an answer would turn on questions of fact; and [¶] (4) any other factors the court may deem appropriate."

The three factors set forth in rule 29.5(a) are met here. The Ninth Circuit has requested that we answer the question it posed; our answer to the

---

[2]Pursuant to our authority under rule 29.5(g) to restate or clarify "[a]t any time" the Ninth Circuit's certified question, we have substituted the word "terminate" for the Ninth Circuit's word "rescind" in the question certified to this court. The reason for the substitution is that the courts below and the parties discuss this action in terms of Pacific Bell's ability to terminate, or otherwise change, its policy, rather than "rescind" it as that term is legally defined. A contract rescission is a statutorily governed event that extinguishes a contract as if it never existed. Rescission is effected by the parties' mutual consent or mistake, failure of consideration, illegality, or other public purpose. (Civ. Code, §§ 1688, 1689.) The word substitution best reflects the decisions below and does not in any way affect the parties' legal analysis.

question will determine the matter before that court. No California case has considered whether or how an employer can modify or cancel a unilaterally implemented employment policy.

The factors outlined in rule 29.5(f) also support our decision to accept the request for an answer to the certified question. The issue presented is important to California courts as well as to the Ninth Circuit, because it involves a significant question of employment contract law. We can expect the issue to arise in our courts, due in part to our opinion in *Scott v. Pacific Gas & Electric. Co.* (1995) 11 Cal.4th 454 [46 Cal.Rptr.2d 427, 904 P.2d 834] (*Scott*). *Scott* held that unilaterally created employment policies are enforceable, but also concluded that "employers have the capacity to alter their policies and practices so as not to create unwanted contractual obligations." (*Id.* at p. 472.) *Scott* left open the question how employers can terminate or modify an existing policy, the focus of our inquiry here. Thus, litigation over how employers can terminate or modify employment policies is likely to follow. (Rule 29.5(f)(2).)

B. *Facts*

In 1986, Pacific Bell issued the following "Management Employment Security Policy" (MESP): "It will be Pacific Bell's policy to offer all management employees who continue to meet our changing business expectations employment security through reassignment to and retraining for other management positions, even if their present jobs are eliminated. [¶] This policy will be maintained so long as there is no change that will materially affect Pacific Bell's business plan achievement."

In January 1990, Pacific Bell notified its managers that industry conditions could force it to discontinue its MESP. In a letter to managers, the company's chief executive officer wrote: "[W]e intend to do everything possible to preserve our Management Employment Security policy. However, given the reality of the marketplace, changing demographics of the workforce and the continued need for cost reduction, the prospects for continuing this policy are diminishing—perhaps, even unlikely. We will monitor the situation continuously; if we determine that business conditions no longer allow us to keep this commitment, we will inform you immediately."

Nearly two years later, in October 1991, Pacific Bell announced it would terminate its MESP on April 1, 1992, so that it could achieve more flexibility in conducting its business and compete more successfully in the marketplace. That same day, Pacific Bell announced it was adopting a new layoff

policy (the Management Force Adjustment Program) that replaced the MESP but provided a generous severance program designed to decrease management through job reassignments and voluntary and involuntary terminations. Employees who chose to continue working for Pacific Bell would receive enhanced pension benefits. Those employees who opted to retire in December 1991 would receive additional enhanced pension benefits, including increases in monthly pension and annuity options. Employees who chose to resign in November 1991 would receive these additional enhanced pension benefits as well as outplacement services, medical and life insurance for one year, and severance pay equaling the employee's salary and bonus multiplied by a percentage of the employee's years of service.

Plaintiffs are 60 former Pacific Bell management employees who were affected by the MESP cancellation. They chose to remain with the company for several years after the policy termination and received increased pension benefits for their continued employment while working under the new Management Force Adjustment Program. All but eight of them signed releases waiving their right to assert claims arising from their employment under the MESP or its termination.

Plaintiffs filed an action in federal district court against Pacific Bell and its parent company, Pacific Telesis Group,[3] seeking declaratory and injunctive relief, as well as damages for breach of contract, breach of fiduciary duty, fraud, and violations of the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1000 et seq.). The parties filed countermotions for partial summary judgment before conducting discovery. The district court granted summary judgment in Pacific Bell's favor against the 52 plaintiffs who signed releases. In an unpublished opinion, the Ninth Circuit affirmed the district court's judgment in this respect.

The district court granted summary judgment on the breach of contract claim in favor of the eight plaintiffs who did not sign releases. It held that even if an employer had the right unilaterally to terminate a personnel policy creating a contractual obligation, that right would not apply in cases where the original employment policy incorporated a term for duration or conditions for rescission, absent stronger evidence of the employees' assent to the policy modification than their continued employment. The court concluded that Pacific Bell could not terminate its MESP unless it first demonstrated (paraphrasing the words of the MESP) "a change that will materially alter Pacific Bell's business plan achievement."

---

[3]*Pacific Telesis Group*, which issued a policy substantially similar to the one Pacific Bell issued, is not directly involved in the certification request because it did not hire or lay off any of the employees remaining in this action. For purposes of economy, therefore, we refer to defendants only as Pacific Bell.

Thereafter, the parties entered into a stipulation providing in part that Pacific Bell "elected not to present any further evidence in this action with respect to the question of whether there has been 'a change that will materially alter Pacific Bell's business plan achievement' . . . and agreed that summary judgment may be entered in favor of the eight remaining Plaintiffs on the issue of liability for their claims of breach of contract by breach of the MES policy . . . ." On May 5, 1997, the district court entered an order approving the stipulation and entered judgment in plaintiffs' favor on the issue.

Pursuant to the parties' agreement, the court certified for interlocutory appeal the issue whether Pacific Bell breached the MESP, and the Ninth Circuit accepted the interlocutory appeal. In a published opinion, the Ninth Circuit stated its certification request and noted that our answer to the certified question would determine the remaining portion of the case pending before it. (*Asmus v. Pacific Bell* (9th Cir. 1998) 159 F.3d 422, 423-425.) The court agreed to abide by our answer. (*Id.* at p. 425.)

## II. DISCUSSION

### A. *California Employment Law*

We held in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), that an implied-in-fact contract term not to terminate an employee without good cause will rebut the statutory presumption of Labor Code section 2922 that employment for an indefinite period is terminable at will. (47 Cal.3d at p. 677.) The *Foley* court observed that the trier of fact can infer an agreement to limit grounds for an employee's termination based on the employee's reasonable reliance on company policy manuals. (*Id.* at pp. 681-682.) In *Scott*, we stated that, in light of *Foley*, we could find "no rational reason why an employer's policy that its employees will not be demoted except for good cause, like a policy restricting termination or providing for severance pay, cannot become an implied term of an employment contract. In each of these instances, an employer promises to confer a significant benefit on the employee, and it is a question of fact whether that promise was reasonably understood by the employee to create a contractual obligation." (*Scott, supra,* 11 Cal.4th at p. 464.) Both *Scott* and *Foley* emphasized that employment policies, manuals, and offers were not exempt from the rules governing contract interpretation. (*Scott, supra,* 11 Cal.4th at p. 469; *Foley, supra,* 47 Cal.3d at p. 681.)

In some cases, an employer adopts a no-layoff policy or provides employees with an employment security policy in order to earn the employees'

loyalty in exchange for granting them job security. This exchange is fair and it may, depending on the facts, provide the basis for an enforceable unilateral contract, i.e., one in which the promisor does not receive a promise in return as consideration. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 213, pp. 221-222; see Befort, *Employee Handbooks and the Legal Effect of Disclaimers* (1991/1992) 13 Indus. Rel. L.J. 326, 342.)

▮ In a unilateral contract, there is only one promisor, who is under an enforceable legal duty. (1 Corbin on Contracts (1993) § 1.23, p. 87.) The promise is given in consideration of the promisee's act or forbearance. As to the promisee, in general, any act or forbearance, including continuing to work in response to the unilateral promise, may constitute consideration for the promise. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 213, p. 221; 2 Corbin on Contracts (1995) § 5.9, pp. 40-46; Rest.2d Contracts, §§ 71, 72; Civ. Code, § 1584.)[4]

As a Court of Appeal observed, "Of late years the attitude of the courts (as well as of employers in general) is to consider [employment security agreements] which offer additional advantages to employees as being in effect offers of a unilateral contract which offer is accepted if the employee continues in the employment, and not as being mere offers of gifts. They make the employees more content and happier in their jobs, cause the employees to forego their rights to seek other employment, assist in avoiding labor turnover, and are considered of advantage to both the employer and the employees." (*Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98,

---

[4]An employment contract in which the employer promises to pay an employee a wage in return for the employee's work is typically described as a unilateral contract. Scholars observe, however, that it is not always easy to determine whether an offer creates a unilateral or bilateral contract. (1 Corbin on Contracts, *supra*, § 1.23, pp. 93-94.) Indeed, the distinction between the contract types often exaggerates the importance of the particular bargain compelling performance without commitment. "In response to these concerns, the Restatement (Second) of Contracts has abandoned the terms 'unilateral' and 'bilateral,' without, however, abandoning the concepts behind them." (*Id.* at § 1.23, p. 94.) In the Restatement Second of Contracts, the unilateral contract is preserved in the phrase, "Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance . . . ." (Rest.2d Contracts, § 45(1).)

Most legal scholars, however, prefer to rely on the traditional terminology to distinguish between the two types of offers and promises because the use of unilateral contract analysis has been growing in recent years, particularly in employment cases. (1 Corbin on Contracts, *supra*, § 1.23, p. 95.) As one scholar observed, "Sometimes innovation does not take the form of a new substantive rule but rather of a new perspective on the problem, reflected in the substitution of a new terminology or analysis for a traditional one. For example, the *Restatement (Second)* abandons the terms 'unilateral' and 'bilateral' as descriptive of contracts . . . . There is no way to assess the extent to which such innovations in terminology and analysis portend innovations of substance." (Farnsworth, *Ingredients in the Redaction of the Restatement (Second) of Contracts* (1981) 81 Colum. L.Rev. 1, 5-6, fns. omitted.) In this case, we retain the distinction between unilateral and bilateral contracts.

99-100 [291 P.2d 91] (*Chinn*) [employer's agreement to pay severance benefits becomes enforceable unilateral contract if employee accepts benefit offer by continuing employment]; see also *Lang v. Burlington Northern R. Co.* (D.Minn. 1993) 835 F.Supp. 1104, 1106 [continued employment constitutes acceptance of arbitration policy added to employment manual after employment commenced]; *Hunter v. Sparling* (1948) 87 Cal.App.2d 711, 723 [197 P.2d 807] [continuing services of employee is adequate consideration for employer's promise to pay future pension].)

■ The parties agree that California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment. We do not further explore the issue in the context here, although we note that whether employment policies create unilateral contracts will be a factual question in each case. (*Chinn, supra,* 138 Cal.App.2d at pp. 99-100.) The parties here disagree on how employers may terminate or modify a unilateral contract that has been accepted by the employees' performance. Plaintiffs assert that Pacific Bell was not entitled to terminate its MESP until it could demonstrate a change materially affecting its business plan, i.e., until the time referred to in a clause in the contract. Pacific Bell asserts that because it formed the contract unilaterally, it could terminate or modify that contract as long as it did so after a reasonable time, gave affected employees reasonable notice, and did not interfere with the employees' vested benefits (e.g., pension and other retirement benefits). Even if we were to require additional consideration, Pacific Bell contends it gave that consideration by offering enhanced pension benefits to those employees who chose to remain with the company after the modification took effect. Both parties rely on cases from other jurisdictions to support their respective positions.

B. *Other Jurisdictions*

Because there is no case in point on the present question in this state, the parties each rely on the rule as stated in other jurisdictions to support their particular views.

Pacific Bell points to the rule in the majority of jurisdictions that have addressed the question whether and how an employer may terminate or modify an employment security policy that has become an implied-in-fact unilateral contract. Regardless of the legal theory employed, the majority of other jurisdictions that have addressed the question conclude that an employer may terminate or modify a contract with no fixed duration period after a reasonable time period, if it provides employees with reasonable notice, and the modification does not interfere with vested employee benefits. (See, e.g., *Elliott v. Board of Trustees* (1995) 104 Md.App. 93 [655

A.2d 46, 51] (*Elliott*); *In re Certified Question* (1989) 432 Mich. 438 [443 N.W.2d 112, 120, 121, fn. 17] (*Bankey*); *Sadler v. Basin Elec. Power Co-op.* (N.D. 1988) 431 N.W.2d 296, 300; *Fleming v. Borden, Inc.* (1994) 316 S.C. 452 [450 S.E.2d 589, 595] (*Fleming*); *Ryan v. Dan's Food Stores, Inc.* (Utah 1998) 972 P.2d 395, 401; *Progress Printing Co., Inc. v. Nichols* (1992) 244 Va. 337 [421 S.E.2d 428, 431] (*Progress Printing*); *Gaglidari v. Denny's Restaurants, Inc.* (1991) 117 Wn.2d 426 [815 P.2d 1362, 1367] (*Gaglidari*); *Leathem v. Research Found. of City Univ.* (S.D.N.Y. 1987) 658 F.Supp. 651, 655.)

Most of these courts refer to general contract law in deciding whether an employer may terminate or modify an employment contract. They reason that because the employer created the policy's terms unilaterally, the employer may terminate or modify them unilaterally with reasonable notice. (See, e.g., *Elliott, supra,* 655 A.2d at p. 51; *Fleming, supra,* 450 S.E.2d at p. 595; *Progress Printing, supra,* 421 S.E.2d at p. 431; *Gaglidari, supra,* 815 P.2d at p. 1367; but see *Bankey, supra,* 443 N.W.2d at pp. 119-120 [relying on public policy grounds, not contract theory, to allow employer to terminate discharge-for-cause policy with reasonable notice].)

*Fleming* indicated that of the three possible approaches to the termination question, it favored the majority approach as the one most consistent with unilateral contract principles. (*Fleming, supra,* 450 S.E.2d at pp. 594-595.) The first approach—to allow termination without notice at any time before completion of the contract—struck the *Fleming* court as too harsh. (*Ibid.*) That approach is now considered obsolete in California. (*Drennan v. Star Paving Co.* (1958) 51 Cal.2d 409, 414 [333 P.2d 757].) *Fleming* also rejected an alternative minority model that would impose bilateral concepts on a unilateral contract to require mutual assent and additional consideration to support the termination. (*Fleming, supra,* 450 S.E.2d at p. 595.) The court settled on the majority approach after recognizing that the employer-employee relationship is not static. *Fleming* stated that "[e]mployers must have a mechanism which allows them to alter the employee handbook to meet the changing needs of both business and employees." (*Ibid.*)

As plaintiffs observe, a minority of jurisdictions today hold that an employer cannot terminate or modify a unilateral employment contract without the employees' express knowledge and consent. (See *Torosyan v. Boehringer Ingelheim Pharm.* (1995) 234 Conn. 1 [662 A.2d 89, 99]; *Brodie v. General Chemical Corp.* (Wyo. 1997) 934 P.2d 1263, 1268; *Robinson v. Ada S. McKinley Community Services* (7th Cir. 1994) 19 F.3d 359, 364.) Like the dissent, they reason that *any* termination or modification of a unilateral employment contract requires additional consideration and acceptance by the

affected employees, because their only choices in light of a pending termination would be to resign or to continue working. (See, e.g., *Demasse v. ITT Corp.* (1999) 194 Ariz. 500 [984 P.2d 1138, 1145] (*Demasse*).)

Most recently, in *Demasse,* the Ninth Circuit certified a question to the Arizona Supreme Court whether a layoff seniority provision (stating that the company will lay off junior employees ahead of senior employees) may be unilaterally modified to permit the employer to lay off employees without regard to seniority status. (*Demasse, supra,* 984 P.2d at p. 1140.) The employee handbook reserved the employer's right to amend, modify, or cancel it. When the employees received the handbook, they signed an acknowledgement that they understood and would comply with its provisions. (*Id.* at p. 1141.) Four years later, the employer modified the layoff policy to base it not on seniority status, but on employee " 'abilities and documentation of performance.' " (*Ibid.*) The plaintiffs were employees whom the company laid off 10 days after the new policy took effect. They sued in federal district court, alleging they were laid off in breach of an implied-in-fact contract. (*Ibid.*)

After the district court found that the employer unilaterally could alter its handbook, the Ninth Circuit certified the question to the Arizona Supreme Court. That court concluded that, although most handbook terms are merely descriptions of the employer's present policies, some could create implied-in-fact contracts, depending on the parties' intent. (*Demasse, supra,* 984 P.2d at p. 1143.) The court adopted the minority rule, holding that once a handbook policy becomes an implied-in-fact contract, the employer cannot unilaterally modify it. (*Id.* at p. 1144.) Any change requires mutual assent, with continued employment being inadequate consideration for the change. (*Id.* at p. 1145.) The court was concerned the employer could alter the contract terms and, on the same day, fire the employee, rendering the original contract illusory. (*Id.* at p. 1147.) It rejected Arizona precedent holding that the employer provided consideration for the change by continuing to provide jobs, and the employees manifested their assent by continuing to work. (*Ibid.*)

Vice Chief Justice Jones's dissent aptly rejected the notion that in order to free itself of future obligations, the company would be required to provide employees with a wage increase or other bonus amounting to new consideration. To do so, the dissent reasoned, would incorrectly impose a bilateral principle on the unilateral relationship, leaving the employer unable to manage its business, impairing essential managerial flexibility, and causing undue deterioration of traditional employment principles. (*Demasse, supra,* 984 P.2d at p. 1156 (dis. opn. of Jones, V. C. J.); see also *Fleming, supra,* 450 S.E.2d at p. 595.)

In preferring the more reasonable majority rule, the dissent also found unsatisfactory the *Demasse* majority's reasoning that employers not wanting to be bound by a handbook's terms are simply free never to issue one in the first place. As the dissent observed, "employers may be unilaterally forced by economic circumstance to curtail or shut down an operation, something employers have the absolute right to do. When the employer chooses in good faith, in pursuit of legitimate business objectives, to eliminate an employee policy as an alternative to curtailment or total shutdown, there has been forbearance by the employer. Such forbearance constitutes a benefit to the employee in the form of an offer of continuing employment. The employer who provides continuing employment, albeit under newly modified contract terms, also provides consideration to support the amended policy manual." (*Demasse, supra*, 984 P.2d at p. 1155 (dis. opn. of Jones, V. C. J.).) We agree with the *Demasse* dissent's thoughtful analysis and find its application of contract principles to the question before it reflected in our own state's developing case law and scholarly treatises. (See, e.g., *Scott, supra*, 11 Cal.4th at p. 472; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 233, p. 241.)

We turn now to plaintiffs' several arguments that would restrict Pacific Bell's right to terminate or modify its MESP.

### C. *Application of Legal Principles*

#### 1. *Consideration*

 Plaintiffs contend that Pacific Bell gave no valid consideration to bind the proposed MESP termination and subsequent modification. According to plaintiffs, when Pacific Bell unilaterally terminated the contract to create a new contract with different terms, it left its employees with no opportunity to bargain for additional benefits or other consideration. The parties' obligations were unequal, and hence, there was no mutuality of obligation for the change.

We disagree. The general rule governing the proper termination of unilateral contracts is that once the promisor determines after a reasonable time that it will terminate or modify the contract, and provides employees with reasonable notice of the change, additional consideration is not required. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 228, p. 236.) The mutuality of obligation principle requiring new consideration for contract termination applies to bilateral contracts only. (*Ibid.*) In the unilateral contract context, there is no mutuality of obligation. (*Ibid.*) For an effective modification, there is consideration in the form of continued employee

services. (*Ibid.*) The majority rule correctly recognizes and applies this principle.[5] (See *ante*, at pp. 11-14.) ▮▮▮ Here, Pacific Bell replaced its MESP with a subsequent layoff policy. Plaintiffs' continued employment constituted acceptance of the offer of the modified unilateral contract. As we have observed, a rule requiring separate consideration in addition to continued employment as a limitation on the ability to terminate or modify an employee security agreement would contradict the general principle that the law will not concern itself with the adequacy of consideration. (*Foley, supra,* 47 Cal.3d at p. 679.)

The corollary is also true. Just as employers must accept the employees' continued employment as consideration for the original contract terms, employees must be bound by amendments to those terms, with the availability of continuing employment serving as adequate consideration from the employer. When Pacific Bell terminated its original MESP and then offered continuing employment to employees who received notice and signed an acknowledgement to that effect, the employees accepted the new terms, and the subsequent modified contract, by continuing to work. Continuing to work after the policy termination and subsequent modification constituted acceptance of the new employment terms. (See *Pine River State Bank v. Mettille* (Minn. 1983) 333 N.W.2d 622, 626-627 [continued employment is sufficient consideration for employment contract modification].)

## 2. *Illusoriness*

▮▮▮ Plaintiffs alternatively claim that Pacific Bell's MESP would be an illusory contract if Pacific Bell could unilaterally modify it. Plaintiffs rely on the rule that when a party to a contract retains the unfettered right to terminate or modify the agreement, the contract is deemed to be illusory. (See 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 234, p. 241.)

▮▮▮ Plaintiffs are only partly correct. Scholars define illusory contracts by what they are not. As Corbin observes, "if a promise is expressly made conditional on something that the parties know cannot occur, no real promise has been made. Similarly, one who states 'I promise to render a future performance, if I want to when the time arrives,' has made no promise at all. It has been thought, also, that promissory words are illusory if they are conditional on some fact or event that is wholly under the promisor's control and bringing it about is left wholly to the promisor's own will and discretion. This is not true, however, if the words used do not leave an unlimited option to the one using them. It is true only if the words used do not in fact purport

---

[5]Curiously, the dissent sides with the minority of jurisdictions that chose to ignore these traditional rules governing unilateral contract termination or modification.

to limit future action in any way." (2 Corbin on Contracts, *supra*, § 5.32, pp. 175-176, fns. omitted.) Thus, an unqualified right to modify or terminate the contract is not enforceable. But the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and reasonable notice. (See *id.* at p. 177; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 233, p. 241.)

■ As Pacific Bell observes, the MESP was not illusory because plaintiffs obtained the benefits of the policy while it was operable. In other words, Pacific Bell was obligated to follow it as long as the MESP remained in effect. Although a permanent no-layoff policy would be highly prized in the modern workforce, it does not follow that anything less is without significant value to the employee or is an illusory promise. (See *Bankey, supra,* 443 N.W.2d at pp. 119-120.) As long as the MESP remained in force, Pacific Bell could not treat the contract as illusory by refusing to adhere to its terms; the promise was not optional with the employer and was fully enforceable until terminated or modified. (2 Corbin on Contracts, *supra,* § 5.32, p. 177.)

### 3. *Vested Benefits*

■ Plaintiffs next allege that the MESP conferred a vested benefit on employees, like an accrued bonus or a pension. But as Pacific Bell observes, no court has treated an employment security policy as a vested interest for private sector employees. (See *Bankey, supra,* 443 N.W.2d at p. 121, fn. 17 [vested rights concept cannot be stretched to include obligations created by employer's written policy statements applicable to general workforce].) In addition, plaintiffs do not allege that Pacific Bell terminated its MESP in bad faith. Although we agree with plaintiffs that an employer may not generally interfere with an employee's vested benefits, we do not find that the MESP gave rise to, or created, any vested benefits in plaintiffs' favor.

### 4. *Condition as Definite Duration Clause*

■ Plaintiffs alternatively contend that a contract specifying termination on the occurrence (or nonoccurrence) of a future happening, in lieu of a specific date, is one of definite duration that cannot be terminated or modified until the event occurs. (See *Wittmann v. Whittingham* (1927) 85 Cal.App. 140, 145 [259 P. 63] [contract to deliver shares of stock when stock dividends or profits had paid note is contract of definite duration]; *La Jolla Casa deManana v. Hopkins* (1950) 98 Cal.App.2d 339, 348 [219 P.2d 871] [contracts specified to last until " 'termination of the present war' " and

until plaintiff " 'can reasonably build a home for herself' " are contracts for definite duration].) Because Pacific Bell declared that it would maintain its MESP "so long as" its business conditions did not substantially change, plaintiffs, like the dissent, assert that the specified condition is automatically one for a definite duration that Pacific Bell is obliged to honor until the condition occurs.

■ Contrary to the view of plaintiffs and the dissent, a "specified condition" may be one for either definite or indefinite duration. Indeed, both plaintiffs and the dissent fail to recognize that courts have interpreted a contract that conditions termination on the happening of a future event as one for a definite duration or time period only when "there is an ascertainable event which necessarily implies termination." (*Lura v. Multaplex, Inc.* (1982) 129 Cal.App.3d 410, 414-415 [179 Cal.Rptr. 847]; see also *Bradner v. Vasquez* (1951) 102 Cal.App.2d 338, 344 [227 P.2d 559].) ■ As Pacific Bell observes, even though its MESP contained language specifying that the company would continue the policy "so long as" it did not undergo changes materially affecting its business plan achievement, the condition did not state an ascertainable event that could be measured in any reasonable manner. As Pacific Bell explains, when it created its MESP, the document referred to changes that would have a significant negative effect on the company's rate of return, earnings, and "ultimately the viability of [its] business." The company noted that if the change were to occur, it would result from forces beyond Pacific Bell's control, and would include "major changes in the economy or the public policy arena." These changes would have nothing to do with a fixed or ascertainable event that would govern plaintiffs' or Pacific Bell's obligations to each other under the policy. Therefore, the condition in the MESP did not restrict Pacific Bell's ability to terminate or modify it, as long as the company made the change after a reasonable time, on reasonable notice, and in a manner that did not interfere with employees' vested benefits. (See, e.g., *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 731 [73 Cal.Rptr. 213, 447 P.2d 325] [contract for indefinite duration terminable after a reasonable time on reasonable notice].)

■ The facts show that those conditions were met here. Pacific Bell implemented the MESP in 1986, and it remained in effect until 1992, when the company determined that maintaining the policy was incompatible with its need for flexibility in the marketplace. The company then implemented a new Management Force Adjustment Program in which employees whose positions were eliminated would be given 60 days to either find another job within the company, leave the company with severance benefits after signing a release of any claims, or leave the company without severance benefits.

The employees were provided with a booklet entitled Voluntary Force Management Programs detailing the new benefits the company provided following the MESP cancellation.

Thus, the MESP was in place for a reasonable time and was effectively terminated after Pacific Bell determined that it was no longer a sound policy for the company. Contrary to the dissent, Pacific Bell did not engage in behavior that one could characterize as "manipulative" or "oppressive." (Dis. opn., *post*, at p. 20.) Employees were provided ample advance notice of the termination, and the present plaintiffs even enjoyed at least two more years of employment and corresponding benefits under a modified policy before they were eventually laid off. In sum, Pacific Bell maintained the MESP for a reasonable time, it provided more than reasonable notice to the affected employees that it was terminating the policy, and it did not interfere with employees' vested benefits. The law requires nothing more.

## III. CONCLUSION

As discussed, our employment cases support application of contract principles in the decision whether an employer may unilaterally terminate an employment security policy that has become an implied-in-fact unilateral contract. (See, e.g., *Foley, supra,* 47 Cal.3d at pp. 678-679.) Under contract theory, an employer may terminate a unilateral contract of indefinite duration, as long as its action occurs after a reasonable time, and is subject to prescribed or implied limitations, including reasonable notice and preservation of vested benefits. (1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 233-234, pp. 240-241.) The facts clearly show that employees enjoyed the benefits of the MESP for a reasonable time period, and that Pacific Bell gave its employees reasonable and ample notice of its intent to terminate the MESP. The company also did not at any time interfere with employees' vested benefits in effecting the MESP termination. In addition, the employees accepted the company's modified policy by continuing to work in light of the modification. Therefore, in response to the Ninth Circuit's certification request, we conclude that we should answer as follows: An employer may terminate a written employment security policy that contains a specified condition, if the condition is one of indefinite duration and the employer makes the change after a reasonable time, on reasonable notice, and without interfering with the employees' vested benefits.

Baxter, J., Brown, J., and Haller, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**GEORGE, C. J.**—I respectfully dissent.

We granted the request of the United States Court of Appeals for the Ninth Circuit to answer the following certified question of law: "Once an employer's unilaterally adopted policy—which requires employees to be retained *so long as a specified condition does not occur*—has become a part of the employment contract, may the employer thereafter unilaterally rescind the policy, even though the specified condition *has not occurred*?" (Italics added.) The majority, however, inexplicably answers a different question— one in which it is assumed by the majority that the employer's policy requires employees to be retained *indefinitely*, because the condition assertedly is unascertainable and thus *may or may not have occurred.*

The entire analysis of the majority opinion rests upon the single false premise that the specified contractual condition permitting Pacific Bell to terminate its "Management Employment Security Policy" (MESP)—the occurrence of a "change that will materially affect Pacific Bell's business plan achievement" ("a serious financial situation")—does not describe "an ascertainable event that could be measured in any reasonable manner." (Maj. opn., *ante*, at p. 17.) This premise (1) conflicts with the language of the certified question, (2) contradicts the record, (3) is inconsistent with Pacific Bell's own briefing and explicit concessions, and (4) is refuted by established contract law. As explained below, the condition allowing termination of the MESP is ascertainable and specifies a definite duration for the MESP. Contrary to the majority's assertion, not even Pacific Bell contends that such a change cannot be measured in a reasonable manner. Indeed, Pacific Bell repeatedly has conceded that the condition has not occurred. Because a contract setting forth an express condition for its termination may not be terminated unilaterally before the condition occurs, Pacific Bell may not terminate the MESP.

The majority incorrectly determines—in a single paragraph at the end of its opinion—that the MESP specifies an unascertainable event for its termination and therefore is a contract term of indefinite duration. Because it mischaracterizes the contractual condition in this manner, the majority erroneously and unnecessarily decides a much broader issue that is not within the scope of the certified question, not properly before this court, and not properly before the Ninth Circuit. The majority thus provides no assistance to the Ninth Circuit in resolving the pending appeal and subverts the certification process. It is particularly unfortunate that the majority reaches out to address a broad issue that is not presented by this case, when the court is so closely divided and lacks the participation of all of its permanent members.

Rather than responding to a question different from that certified to us by the Ninth Circuit and presented by the record, I would answer the certified question with a simple "no." Once an employer's unilaterally adopted policy—which requires employees to be retained so long as a specified condition does not occur—has become a part of the employment contract, the employer may not rescind the policy unilaterally if the specified condition has not occurred. To the extent the majority addresses a different issue regarding the termination of an employment security policy that does not contain such a condition, its discussion is unnecessary to the proper resolution of this matter and, in any event, is contrary to established principles of contract law.

Under the majority's contract analysis, an employer unilaterally may terminate an express promise of job security to a current employee—offered specifically to induce employees not to resign in good economic times, when there is a shortage of labor and a high demand for qualified employees—simply because the promise later becomes inconvenient or financially disadvantageous to the employer during an economic downturn, a time when the employee would most expect to be able to rely upon and benefit from the employer's promise. Not only is such a result entirely inconsistent with fundamental tenets of contract law, but it also condones and encourages manipulative, oppressive, and unfair treatment of employees. An employer's implied-in-fact contractual promise would not be binding upon the employer but would be only as good as the employer's desire to keep the promise at some unspecified point in the future. And in the majority's view, not even a promise to maintain the promise for a specified duration constitutes a real promise. I cannot join in this failure faithfully to apply well-established principles of contract law to employment contracts. If an employer wishes to escape its own voluntarily incurred contractual obligations, it may do so prospectively with regard to new employees, and it may negotiate with those employees covered under existing agreements by offering additional consideration and obtaining the individual assent of the employees to the termination of the employer's obligations.

I

The MESP adopted by Pacific Bell in 1986 states: "In support of a business partnership among all elements of the work force, employment security commitments have been established. An employment security commitment which applies specifically to management employees follows. [¶] It will be Pacific Bell's policy to offer all management employees who continue to meet our changing business expectations employment security through reassignment to and retraining for other management positions, even

if their present jobs are eliminated. [¶] *This policy will be maintained so long as there is no change that will materially alter Pacific Bell's business plan achievement.*" (Italics added.)

After setting forth this employment security commitment, the MESP states that the commitment is in many ways self-explanatory, but that additional information in a question-and-answer format is included to help clarify some of the issues that surround it. For example, in responding to a question regarding the meaning of the phrase "employment security," the MESP recognizes "the legitimate need for all employees to work in a reasonably stable environment, free of anxiety about their future at work," and explains that managers, in turn, must be flexible and willing to change by participating in reassignment and retraining.

With regard to the meaning of a "change that will materially alter Pacific Bell's business plan achievement," the MESP states: "In order to meet any employment commitment a business must maintain a viable financial position. Although we are very confident about our future, it is possible that major changes in the economy or the public policy arena could have a significant negative effect on our rate of return, earnings and ultimately the viability of our business. *If that occurred,* we would be forced to reassess the commitment. *But it should be emphasized that this phrase is not intended to be an 'easy out' for the company; it truly refers to a serious financial situation.*" (Italics added.)

It is undisputed that the MESP, once adopted, became a term of the employment contract between Pacific Bell and plaintiffs. Six years after the policy was promulgated, Pacific Bell purported to cancel unilaterally the MESP, effective April 1, 1992.

In a memorandum informing managers of the cancellation, Pacific Bell explained that shifts in the marketplace suggested that its ability to compete successfully depended upon greater flexibility in personnel matters, and that such flexibility would allow cost reduction and competitive pricing. The memorandum stated that this requirement of flexibility was incompatible with any form of management employment security. Nothing in this document or in other materials presented on summary judgment, however, indicated that Pacific Bell was faced with a serious financial situation that would have a significant negative effect on its rate of return or earnings, materially alter its business plan achievement, or threaten the viability of its business, as those terms are used in the MESP. Instead, this memorandum and other materials provided to managers emphasized that Pacific Bell simply was continuing previous cost reduction efforts that predated the adoption of the

MESP, including eliminating "pockets of management surplus," in order to compete more successfully.

In 1996, plaintiffs commenced an action in federal district court alleging, among other things, that Pacific Bell breached the MESP. With regard to the breach of contract claim, the district court initially denied the competing summary judgment motions, of both Pacific Bell and plaintiffs on the ground that insufficient evidence had been presented regarding whether there had been a change that would materially affect Pacific Bell's business plan achievement. At the hearing on the motions and in its written order, the court observed that Pacific Bell had not contended in its briefing that it was entitled to terminate the MESP because the specified condition had occurred. The district court concluded that in cases "in which the original employment policy incorporates a term regarding duration or the circumstances under which rescission is possible . . . , an employer is bound by the duration of the policy or the terms for rescission that it unilaterally established, absent some stronger evidence of employee assent to the proposed modification than the fact that employees have chosen to remain employed."

Pacific Bell subsequently informed the district court that it elected not to litigate the issue whether the condition in the MESP had occurred, and that Pacific Bell would stipulate that summary adjudication could be entered in favor of plaintiffs for breach of the MESP so that the issue could be certified for an interlocutory appeal. At a hearing regarding the stipulation, the following exchange occurred: "[The court]: And you're willing to waive your claim that there was [an] adequate business reason to abrogate the [MESP]? [¶] [Pacific Bell's counsel]: Correct, we would not litigate that. [¶] . . . [¶] We would not ask to put evidence [in] on that."

Accordingly, the district court "[g]ranted summary adjudication that . . . [p]laintiffs who worked after the [MESP] was implemented were entitled to its benefits so long as . . . there was 'no change that will materially alter Pacific Bell's business plan achievement.'" The court's subsequent order explains: "Defendants argued that they effectively canceled this unilaterally implemented personnel policy by giving notice of cancellation and additional consideration in the form of new benefits. This Court held that the policy could not be canceled, except by its own terms, i.e., unless Pacific Bell could establish a change that materially altered its business plan achievement. Defendants stipulated that they would not present evidence to establish that financial condition." (Italics added.)

In the briefs it filed in the Ninth Circuit, Pacific Bell asserted that it has a right to cancel the MESP unilaterally, notwithstanding the specification of

an express condition for rescission of the MESP. According to Pacific Bell, the provision in the MESP regarding a change affecting its business plan achievement is a clause that addresses *one possible* duration of the policy. This clause, Pacific Bell contended, did not limit its right to modify unilaterally either the policy or its duration provision. Regarding Pacific Bell's stipulation in the district court that it would not present further evidence concerning the issue, Pacific Bell stated in its reply brief: "The [MESP] set a specific economic standard for when Pacific Bell could conduct layoffs. All the stipulation did was to provide that Pacific Bell was *not claiming to have met that standard*." (Italics added.) Pacific Bell did not assert that the MESP is a contract term of indefinite duration or that the condition specified for termination of the MESP is unascertainable.

It is in this context that the Ninth Circuit requested, and we granted, certification of the question of law quoted above.

## II

In view of the foregoing history of the underlying case in the federal courts, and the phrasing of the certified question, there can be no doubt that, in requesting certification, the Ninth Circuit contemplated that the condition specified for the termination of the MESP describes the occurrence of an event that could be ascertained by Pacific Bell and is subject to proof by the presentation of evidence. Otherwise, the question would not have been phrased in terms of a condition "that has not occurred," because if the condition were unascertainable, there would have been no means for determining that the condition had not occurred. Furthermore, nothing in the record or the briefing presented to the Ninth Circuit suggested that the event was unascertainable.

Nevertheless, the majority decides that a change materially affecting Pacific Bell's business plan achievement is not ascertainable—and thus cannot define the duration of the MESP—because such a change cannot be measured in any reasonable manner. The issue whether such a change can be measured or is subject to proof by the presentation of evidence, however, never was raised in the federal courts. Accordingly, even if Pacific Bell had raised this issue in this court (it has not), the Ninth Circuit would not permit Pacific Bell to rely upon such a contention.[1] Moreover, this contention is contradicted by Pacific Bell's own briefing in the Ninth Circuit, where it

---

[1] As Pacific Bell stated in its briefing in the Ninth Circuit, only under certain narrow circumstances will that court review an issue raised for the first time on appeal: (1) to prevent a miscarriage of justice; (2) when a change in the law raises a new issue while the appeal is pending; and (3) when the issue is purely one of law. (*Parks School of Business, Inc. v.*

described the change as "nothing more than a measure of business conditions that Pacific Bell would use to determine the viability of continuing job security" and "a specific economic standard for when Pacific Bell could conduct layoffs." By going beyond the certified question and the record of the federal proceedings to reach out to resolve an issue that never was raised, the majority thwarts the purpose and scope of the certification process.

Because the majority does not answer the certified question, the majority's answer will not be "determinative of a cause pending in the certifying court . . . ." (Cal. Rules of Court, rule 29.5(a)(2).) When considering whether to grant a certification request, we consider, among other things, "whether answering the question will facilitate the certifying court's functioning or help terminate existing litigation," and "the extent to which an answer would turn on questions of fact." (*Id.*, rule 29.5(f)(2) & (3).) In choosing to modify the certified question, the majority posits and answers a question irrelevant to the federal litigation. There is no basis in the record for the majority to determine that a change materially affecting Pacific Bell's business plan achievement cannot be ascertained or measured. The parties presented no evidence regarding this issue on summary judgment, and their briefs do not allude to any extraneous facts supporting the majority's resolution of this factual question.

Because the entire majority opinion depends upon its resolution of this irrelevant issue, the answer provided by the majority will not facilitate the Ninth Circuit's functioning or help terminate the litigation. Although we have authority to restate the certified question (Cal. Rules of Court, rule 29.5(g)), we should do so only when this will further—rather than frustrate—the certification process. We should not ignore the record of the federal proceeding in doing so, nor should we restate the question to reach an issue that is not presented.

Accordingly, even if I were to agree with the conclusion reached by the majority, I would feel compelled to disagree with the manner in which it unjustifiably has transformed the certified question. (Cf. *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 360, fn. 2 [93 Cal.Rptr.2d 1, 993 P.2d 334 [requesting the certifying court to notify us in the event it had any objection to our restatement of the certified question].) As I shall explain, however, I believe that the substantive legal conclusions reached by the majority also are fundamentally flawed.

### III

When an employment contract specifies that the employer's obligations will be terminated upon the occurrence of a future event, the employer is

---

*Symington* (9th Cir. 1995) 51 F.3d 1480, 1488.) None of these circumstances apply to the new issue raised by the majority.

bound by the contract unless and until the event occurs—even if it is impossible for the parties to know when or whether the event will occur. (*Hartman v. San Pedro Coml. Co.* (1944) 66 Cal.App.2d 935, 936-937 [153 P.2d 212]; Simpson, Law of Contracts (2d ed. 1965) § 48, pp. 74-75; see Rest.2d Contracts, § 230.) As set forth above, the MESP provides that it will continue in effect so long as there is no change materially affecting Pacific Bell's business plan achievement. In its opening brief in this court, Pacific Bell expressly concedes that it did not cancel the MESP because the corporation's viability as a business was threatened. Pacific Bell similarly conceded at oral argument in this court that the specified condition permitting termination of the MESP has not occurred.

Instead, as in the Ninth Circuit, Pacific Bell contends that the MESP sets forth only one specific instance in which the policy would be discontinued and does not constitute a waiver of Pacific Bell's right to change the policy in other instances. In addition, Pacific Bell asserts for the first time in this court that the language of the MESP does not contain a duration clause, because the language does not state a definite time period during which the policy would be in effect. According to Pacific Bell, a contract is for a definite duration only if the specified event giving rise to its termination is ascertainable. Pacific Bell defines an ascertainable event as one that inevitably will occur and that relates specifically to the parties' obligations to one another under the contract. Claiming that changes threatening the viability of its business are not inevitable and have nothing to do with plaintiffs' or Pacific Bell's obligations to each other under the policy, Pacific Bell asserts that such changes are not ascertainable and therefore do not establish a fixed duration for the MESP.

As established above, when answering a certified question we generally should not consider legal and factual theories raised by a party for the first time in this court. Therefore, in my view, Pacific Bell has waived any contention that a change "materially alter[ing its] business plan achievement," within the meaning of the MESP, is not ascertainable and that the contract is one of indefinite duration. Moreover, Pacific Bell's assertion that an event defining the duration of a contract is ascertainable only if it is inevitable is refuted by the very authority upon which Pacific Bell relies. Contrary to Pacific Bell's contention and the majority's conclusion, the MESP is a contract for a definite duration. Therefore, Pacific Bell may not terminate the MESP unilaterally before the event defining its duration has occurred.

Pacific Bell offers no factual or legal support for its position that the event specified in the MESP describes only one possible instance in which the

policy might be terminated. The clear language of the employment security commitment itself demonstrates that this position is untenable: "This policy *will be maintained* so long as there is no change that will materially alter Pacific Bell's business plan achievement." (Italics added.) The provision does not state that Pacific Bell *might* maintain the policy if no such a change occurs, but rather provides that the policy *will* continue as long as there is no such change. Similarly, the MESP does not advise employees that Pacific Bell could terminate the policy for numerous reasons, one of which might be a change altering its business plan achievement. Instead, the MESP very clearly specifies the duration of the commitment. Indeed, in clarifying the meaning of this provision, the MESP reflects an intention that the *only* circumstance in which Pacific Bell would fail to honor its commitment is where it would be faced with a serious financial situation threatening the viability of its business. The MESP "emphasized that this phrase is not intended to be an 'easy out' for the company . . . ." Because the single specified condition was not intended to be an "easy out," it is entirely inconsistent with Pacific Bell's intention, as expressly stated in the MESP, for the majority to construe the policy as permitting termination in less dire financial circumstances merely because Pacific Bell wishes to compete more successfully.

Contrary to the unsupported theory advanced by the majority and Pacific Bell, numerous decisions have upheld contractual duration provisions that do not specify a presently definite or fixed time period governing the obligations of the parties. (*Long Beach Drug Co. v. United Drug Co.* (1939) 13 Cal.2d 158, 165-166 [88 P.2d 698], and cases cited therein.) For example, in *Great Western etc. v. J. A. Wathen D. Co.* (1937) 10 Cal.2d 442, 444 [74 P.2d 745], the defendant agreed to sell goods exclusively to the plaintiff " 'as long as the plaintiff purchases and continues to purchase from the defendant . . . .' " The defendant contended that the contract was for an indefinite time and therefore was terminable at the will of either party. We disagreed and held that the contract was not silent with regard to its duration, and that the specified period was sufficiently certain to be enforced. (*Id.* at pp. 446-447.) Similarly, in *Sutliff v. Seidenberg, Stiefel & Co.* (1901) 132 Cal. 63, 65 [64 P. 131], a distributorship agreement provided that it was " 'to remain in force as long as [the defendant's] goods find ready sale' " on the West Coast. We held that the contract was not "so 'vaguely expressed as to be wholly unascertainable.' " (*Id.* at p. 66.) The parties in *Noble v. Reid-Avery Co.* (1928) 89 Cal.App. 75, 78 [264 P. 341], entered into an agreement giving the plaintiffs the exclusive right to sell the defendant's goods " 'as long as they were able to give faithful service and a business management to the trade and produce the trade that was warranted in the territory allotted to them, and no longer.' " In response to the defendant's contention that the

duration of the agreement could not be ascertained from the contract, the court held that the duration provision was sufficiently certain and valid. (*Ibid.*)

As the foregoing decisions illustrate, Pacific Bell is incorrect in asserting that an event specifying the duration of a contract is ascertainable only if it is fixed and inevitably will occur. Even in decisions *implying* a duration clause in contracts otherwise silent on the issue, the event terminating a party's obligations under the contract need not be fixed or inevitable. (E.g., *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 729-730 [73 Cal.Rptr. 213, 447 P.2d 325] [contract included an implied ascertainable term requiring performance as long as there was a possibility that the defendants might undertake to present live stage performances]; *Lura v. Multaplex, Inc.* (1982) 129 Cal.App.3d 410, 414-415 [179 Cal.Rptr. 847] [agreement to pay commissions to the plaintiff implicitly would terminate when the defendant ceased making sales]; *Wittmann v. Whittingham* (1927) 85 Cal.App. 140, 144-145 [259 P. 63] [employment contract would terminate when the employee's stock dividends or profits had repaid him on his note for the purchase of the stock].)

Also unfounded is Pacific Bell's and the majority's assertion that an ascertainable event permitting termination must be an event specifically related to the parties' obligations to one another under the contract. To the extent this assertion is intended to suggest that the event must involve or result from the specific duties of the parties under the contract, the suggestion is incorrect. (See, e.g., *La Jolla Casa deManana v. Hopkins* (1950) 98 Cal.App.2d 339, 341 [219 P.2d 871] [contract conferred a right to occupy a dwelling until a specified period after the termination of war]; *Hartman v. San Pedro Coml. Co.*, *supra*, 66 Cal.App.2d 935, 936-937 [contract could be terminated if one party entered the Armed Forces and failed to return].) Even if one were to conclude that the specified event had to relate to the parties' contractual obligations, however, the event specified in the MESP did concern Pacific Bell's obligation to plaintiffs under the MESP. As the policy itself explains, in order to meet the employment security commitment, Pacific Bell needed to maintain a viable financial position. If the company faced a serious financial situation in which honoring the commitment would threaten the viability of its business, Pacific Bell would be forced to reassess the commitment. Thus, a change materially altering its business plan achievement would have *much* to do with Pacific Bell's performance under the MESP and would govern its obligation to plaintiffs to honor the commitment. Or, using the test adopted by the majority for determining whether a contractual obligation is one for a definite duration, such a change " 'necessarily implies termination' " of Pacific Bell's obligation to comply with

the MESP. (Maj. opn., *ante*, at p. 17.) Pacific Bell's contention that such a change would have nothing to do with Pacific Bell's obligation to plaintiffs under the policy not only contradicts the language of the policy but also makes no sense.

The majority opinion includes an additional reason—not raised by Pacific Bell—why the MESP does not involve a contract term for a fixed duration. According to the majority, the MESP "did not state an ascertainable event that could be measured in any reasonable manner." (Maj. opn., *ante*, at p. 17.) Although its analysis is unclear on the point, the majority appears to conclude that the change referred to by the MESP cannot be measured, because it would result from forces beyond Pacific Bell's control, such as changes in the economy or in the public policy arena.

The majority offers no justification for its conclusion that the condition cannot be measured. As established above, Pacific Bell's intention as expressly set forth in the MESP is that the company would reassess its employment security commitment only if major changes in the economy or public policy had a significant negative effect on its rate of return, its earnings, and ultimately the viability of its business. The majority does not attempt to explain why Pacific Bell would be unable to measure in a reasonable manner negative effects on its rate of return or earnings, or would be unable to assess whether such effects would threaten the viability of its business. The circumstance that such financial changes would result from factors beyond the control of Pacific Bell does not establish that changes to the company's own financial condition cannot be measured. A major corporation such as Pacific Bell undoubtedly knows very well how to assess its financial condition and any changes affecting its viability as a business, and indeed has an obligation to its shareholders to report such information. (See, e.g., Corp. Code, § 1501.) Indeed, in its briefing in the Ninth Circuit, Pacific Bell described this condition as a "measure of business conditions" and a "specific economic standard." Thus, Pacific Bell's own characterization of the condition belies the majority's conclusion that the condition is an indefinite, unascertainable event that cannot be measured.

Pacific Bell is the party that drafted the language of the MESP and explained its meaning to the affected managers. It is difficult to understand why Pacific Bell would have included this language if it did not believe that such a change could be ascertained in a reasonable manner. Certainly the MESP indicates that Pacific Bell intended to induce its managers to believe that this clause means *something*, yet the majority concludes that it means *nothing*. Furthermore, it is difficult to imagine why Pacific Bell would concede that the change has not occurred, if it is impossible to ascertain

whether or not the change has occurred. At a minimum, plaintiffs should be afforded an opportunity to present extrinsic evidence regarding the meaning of this clause before a court declares that the contract term is meaningless. (See 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, § 975, p. 920.)

By refusing to give effect to the condition specified in the MESP for its termination, the majority violates the principle that the law does not favor the voiding of contracts because of uncertainty, and that courts will, if feasible, construe agreements to effectuate the reasonable intentions of the parties. (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; Civ. Code, §§ 1643, 3541.) The language of the MESP and Pacific Bell's own characterization of the condition for its termination leave no doubt the parties intended that the condition could be measured and ascertained. In any event, because Pacific Bell drafted the language, any uncertainty must be resolved against Pacific Bell. "In cases of uncertainty . . . , the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.) To the extent it is unclear how the occurrence of a change materially affecting Pacific Bell's business plan achievement can be ascertained or measured, we must conclude the condition reasonably may be ascertained by reference to its purpose.

Pacific Bell has chosen not to present evidence that the condition occurred, and indeed has conceded that it has not occurred. Pacific Bell cites no authority suggesting that a contract specifying a definite condition for its duration may be terminated unilaterally before the condition occurs, and at oral argument in this court Pacific Bell conceded that if the MESP is a policy of definite duration, the policy cannot be cancelled unilaterally. As Pacific Bell further acknowledges, the circumstance that the MESP was part of a unilateral implied-in-fact employment contract does not alter the applicability of the principles of contract law set forth above. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677-681 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) Therefore, Pacific Bell could not terminate the MESP unilaterally without breaching the contract.

IV

I believe that the analysis and conclusion set forth in the immediately preceding section provide a complete answer to the certified question. Neither the majority nor Pacific Bell cites any authority supporting the proposition that a contract—including an implied-in-fact contract arising from an employer's unilaterally adopted employment security policy—may

be terminated unilaterally before the occurrence of an express condition that defines the duration of the contract. That is the issue upon which we granted certification and the only issue we properly may answer. Therefore, we have no occasion in this proceeding to address the issue whether an employment security policy *that does not contain such a condition* may be terminated unilaterally by the employer. In view of the record and the history of the underlying litigation in the federal courts, the majority's discussion of this issue cannot be justified.

In any event, the majority's conclusion that an employer unilaterally may modify or terminate an employment security policy that lacks an express duration provision, simply by maintaining it for a reasonable time and giving reasonable notice of the proposed modification or termination, is contrary to basic principles of contract law. An employer may not unilaterally modify or terminate an employment security policy that has become part of the employment contract, without providing additional consideration and obtaining the employee's assent. Simply giving notice of the new policy and obtaining the employee's continued performance under the preexisting agreement are insufficient to establish a modification of the agreement.

The statutory presumption of at-will employment (Lab. Code, § 2922) may be overcome by evidence that the parties agreed the employer's power to terminate the employee would be limited in some manner. (*Foley, supra,* 47 Cal.3d at p. 677.) Such evidence may consist of the employee's reasonable reliance upon the company's personnel manual or policies. (*Id.* at pp. 681-682.) An implied-in-fact contract term of employment security stands on equal footing with express terms, and no independent consideration or express manifestation of mutual assent is required. (*Id.* at pp. 677-678.) The employee's rendition of services over time supports the employer's promise to refrain from dismissal in violation of the adopted policy. (*Id.* at p. 679.)

Our decision in *Foley* rejected the employer's assertion that various public policy reasons should preclude enforcement of such employment security agreements. We emphasized that these agreements must be interpreted and enforced according to principles of contract law. "[E]mployment security agreements are [not] so inherently harmful or unfair to employers, who do not receive equivalent guaranties of continued service, as to merit treatment different from that accorded other contracts. On the contrary, employers may benefit from the increased loyalty and productivity that such agreements may inspire. [Citation.] Permitting proof of and reliance on implied-in-fact contract terms does not nullify the at-will rule, it merely treats such contracts in a manner in keeping with general contract law. [Citation.] We see no sound reason to exempt the employment relationship from the ordinary rules

of contract interpretation which permit proof of implied terms." (*Foley*, *supra*, 47 Cal.3d at pp. 680-681.)

We reiterated these principles in *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454 [46 Cal.Rptr.2d 427, 904 P.2d 834] (*Scott*), which held that a policy specifying that employees will not be demoted without good cause can become an implied-in-fact term of an employment agreement. Our decision in *Scott* explains that an employer policy conferring benefits upon employees long has been considered an offer of a unilateral contract that is accepted if the employee continues in the employment. (*Id.* at p. 464, citing *Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98, 100 [291 P.2d 91] [such policies "make the employees more content and happier in their jobs, cause the employees to forego their rights to seek other employment, assist in avoiding labor turnover, and are considered of advantage to both the employer and the employees"].) In *Scott* as in *Foley*, we rejected the employer's invitation to engage in a balancing of competing policy interests, and stressed that when the action is premised upon an implied-in-fact employment contract, we shall enforce the terms of the contract unless they are illegal or unconscionable. (*Scott*, *supra*, 11 Cal.4th at p. 471.)[2]

The parties agree that the MESP was an offer for a unilateral contract that plaintiffs accepted by continuing employment. The issue addressed in the majority opinion is whether an employer may modify an implied-in-fact employment security agreement lacking an express duration provision, simply by announcing a different policy.

"Modification is a change in the obligation by a modifying agreement, which requires mutual assent, and must ordinarily be supported by consideration. [Citations]." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 909, p. 814.) "[U]nder the traditional view, a promise by an employer or an employee under a subsisting contract to do more or take less than that contract requires is invalid unless the other party gives or promises to give something capable of serving as consideration." (3 Williston on Contracts (4th ed. 1992) § 7:37, pp. 604-605, fn. omitted.) Consideration may be either a benefit conferred upon the promisor or a detriment suffered

---

[2]In *Scott*, we observed that "employers have the capacity to alter their policies and practices so as not to create unwanted contractual obligations." (*Scott*, *supra*, 11 Cal.4th at p. 472.) It is unclear whether this dictum refers to the capacity to alter contractual obligations prospectively, or to the capacity to modify existing implied contractual terms. In any event, our opinion in *Scott* emphasizes that we were not confronted with and did not decide that issue. (*Ibid.*) Thus, to the extent the majority relies upon this dictum in *Scott* to support the conclusion that this state's "developing case law" indicates that employers unilaterally may modify an existing implied-in-fact employment contract (maj. opn., *ante*, at p. 14), such reliance is misplaced.

by the promisee. (1 Witkin, *supra*, Contracts, § 208, p. 217.) Doing or promising to do what one already is legally bound to do cannot be consideration for a promise. (*Id.*, § 221, p. 227.)

Under these principles, Pacific Bell's modification of the employment contract to eliminate the MESP requires the assent of plaintiffs to take less under the contract. Plaintiffs' mere continued performance under the original agreement does not indicate assent to the modification. To be supported by consideration, an agreement by plaintiffs to forgo the benefits of the established security agreement must include some additional benefit to the plaintiffs. Continued employment under less favorable conditions was not a benefit to plaintiffs. Instead, *Pacific Bell* obtained the benefit of removing the restriction upon its continuing obligation to employ plaintiffs under the preexisting unilateral contract.

As one commentator has noted, the fallacy underlying decisions upholding unilateral modification in this context is that the modification of a contract is completely analogous to its formation. (Sullivan, *Unilateral Modification of Employee Handbooks: A Contractual Analysis* (1995) 5 Regent U. L.Rev. 261, 288-293.) The general rule that the act of continuing employment with knowledge of new or changed conditions may create binding obligations was framed initially in decisions in which the courts considered the *formation* of a unilateral contract. Continuing to perform and insisting upon one's rights under an existing contract, however, are not proper grounds from which to imply a party's assent to a subsequent *modification* of that contract. In addition, as with all contracts, in order to modify an employment security agreement, the employer must provide some new term or benefit that inures to the advantage of all affected employees. "A promise to do less than one is legally obligated to do cannot constitute consideration." (*Id.* at p. 292, fn. omitted.) "To argue that a contract is effectively modified simply because the same transactions which led to its formation have again occurred is an overly simplistic and incorrect axiom." (*Id.* at p. 293.)

The majority endorses this overly simplistic and incorrect view of the modification of contracts. It relies upon the so-called majority approach in other jurisdictions that permits employers to terminate benefits unilaterally under implied-in-fact employment agreements merely by giving reasonable notice. As I shall explain, however, the opinions adopting such a rule either expressly reject traditional principles of contract law or contain no independent contract analysis of the issue. Of those decisions resolving the issue by examining the law governing modification of ordinary contracts, all such decisions hold that, in order for the modification to be binding, the employer must provide additional consideration and the employee must assent to the

modification. Because it is beyond question that under California law we must apply traditional principles of contract law in resolving this issue (*Foley, supra*, 47 Cal.3d at pp. 677-681), I conclude, consistent with all courts that have engaged in a traditional contract analysis of this issue, that an employer may not modify an employment security agreement unilaterally, simply by maintaining the policy for a reasonable time and giving reasonable notice of the proposed modification.

The leading case adopting the so-called majority rule determined that unilateral contract analysis was insufficient to resolve the issue, and thus decided the question based upon public policy considerations—that the employer has a legitimate expectation that it may modify employment policies for economic and business reasons. (*In re Certified Question* (1989) 432 Mich. 438 [443 N.W.2d 112, 119-120] (*Bankey*).) In a subsequent decision addressing whether an employer unilaterally could modify an *express* contract term in an employment agreement, however, an intermediate appellate court in the same jurisdiction held that continued employment alone was insufficient to indicate the employee assented to the modification: "[A]cceptance cannot be presumed from the mere fact of continued employment; otherwise, how would such an offer ever be rejected, absent one leaving employment?" (*Farrell v. Automobile Club of Michigan* (1990) 187 Mich.App. 220 [466 N.W.2d 298, 301] [distinguishing *Bankey*]; see also *Holland v. Earl G. Graves Pub. Co., Inc.* (E.D.Mich. 1998) 46 F.Supp.2d 681, 688-689 [same, applying Michigan law].)

Because under California law implied-in-fact employee agreements stand on equal footing with express contracts, *Bankey*'s analysis and conclusions are not persuasive for our purposes. Contrary to the majority's suggestion that most of the courts adopting the so-called majority approach rely upon contract law because they *refer to* contract law (maj. opn., *ante*, at p. 12), actually most of these decisions simply rely upon *Bankey* and/or asserted public policy considerations to justify their conclusions.[3]

Courts adopting the so-called minority rule, however, engage in an analysis of traditional principles of contract law and conclude that under such an

---

[3]*Ferrera v. Nielsen* (Colo.Ct.App. 1990) 799 P.2d 458, 460 (relying upon *Bankey* and an inapposite Alabama decision regarding the formation, not modification, of an employment contract); *Parker v. Boise Telco Fed. Credit Union* (1996) 129 Idaho 248 [923 P.2d 493, 499] (relying upon *Bankey* and its determination that any contrary rule would impose an undue burden upon employers); *Elliott v. Board of Trustees* (1995) 104 Md.App. 93 [655 A.2d 46, 51-52] (relying upon Michigan common law as set forth in *Bankey*, with no independent analysis of the issue); *Fleming v. Borden, Inc.* (1994) 316 S.C. 452 [450 S.E.2d 589, 595] (relying upon the notion that "the employer-employee relationship is not static," and that employers therefore "must have a mechanism which allows them to alter the employee handbook to meet the changing needs of both business and employees"); *Gaglidari v. Denny's Restaurants, Inc.* (1991) 117 Wn.2d 426 [815 P.2d 1362, 1367-1368] (relying upon *Bankey* and authorities that did not concern the modification of an existing agreement); *Hogue v.*

analysis, an employer may not modify an existing contract unilaterally. They reject the policy-based approach of *Bankey* and its progeny. For example, in *Brodie v. General Chemical Corp.* (Wyo. 1997) 934 P.2d 1263, 1267-1268 (*Brodie*), the Wyoming Supreme Court stated: "Employer contends that finding an implied-in-fact contract by recognition of handbook provisions involves an analysis which does not apply the normal contract law principles afforded to express contracts and further asserts that the distinction of express versus implied permits our applying different rules for modifying a handbook contract. The Michigan Supreme Court utilized an interpretation similar to Employer's argument in [*Bankey, supra,* 443 N.W.2d 112, 116] . . . . In *Bankey,* the Michigan Supreme Court . . . permit[ted] unilateral modifications because handbook promises were not enforceable under a contract theory, but rather under broad public policy considerations. [Citation.] [¶] The *Bankey* rationale is inapposite for our purposes because, as explained above, our handbook decisions hold that an implied employment contract does arise from established contract law principles and our contract law concerning modification is well settled that an agreement altering a written contract, to be binding, must be based on consideration. [Citation.] . . . [E]stablished contract law principles apply to the employment contract whether express or implied. [Citation.]"

Some of the cases permitting unilateral modification of the agreement— like the majority opinion—rely upon decisions concerning the formation or modification of agreements that result in *additional* benefits to the employee such as job security.[4] (E.g., *Pine River State Bank v. Mettille* (Minn. 1983) 333 N.W.2d 622, 626-630 [a contract modification in which the employer promised additional job security was supported by consideration consisting

*Cecil I. Walker Machinery Co.* (1993) 189 W.Va. 348 [431 S.E.2d 687, 690-691] (relying upon *Bankey* and policy reasons); *Trombley v. Southwestern V. Med. Center* (Vt. 1999) 738 A.2d 103, 109 (citing *Bankey* and other out-of-state decisions, with no independent analysis).

Subsequent to its decision in *Gaglidari v. Denny's Restaurants, Inc., supra,* 815 P.2d 1362, the Washington Supreme Court expressly acknowledged that, under the law of its state, traditional contract principles generally do not govern implied promises of special treatment contained in employee handbooks. (*DePhillips v. Zolt Const. Co.* (1998) 136 Wn.2d 26 [959 P.2d 1104, 1109-1110].)

[4]*Jones v. Central Peninsula General Hosp.* (Alaska 1989) 779 P.2d 783, 787 and footnote 2 (containing no analysis other than citation to out-of-state decisions regarding the formation, rather than modification, of an employment contract with a job security provision); *Ferrera v. Nielsen, supra,* 799 P.2d 458, 460 (relying upon an Alabama decision regarding the formation of an employment contract); *Ryan v. Dan's Food Stores, Inc.* (Utah 1998) 972 P.2d 395, 401 (adopting the reasoning of a lower court, which in turn had relied upon decisions concerning the formation of implied-in-fact employment agreements).

*Ferrera's* reliance upon Alabama common law in support of its conclusion is particularly misguided in light of that state's subsequent holding that an employer may *not* modify an employment agreement unilaterally. (*Ex parte Amoco Fabrics and Fiber Co.* (Ala. 1998) 729 So.2d 336, 340-341.)

of continued employment]). The problem with the reasoning of these cases is that it fails to account for the circumstance that the parties have a preexisting contractual relationship including the employment security policy, and that the employer's modification of that policy divests the employee of a valuable contract right.

Under contract law, we cannot simply ignore the original agreement and find that the employer has offered a new agreement that is accepted by continued performance, as was the original agreement. When the employment relationship begins, or when the employer confers additional benefits upon the employee such as a job security policy, it is reasonable to conclude that the employee accepts the unilateral offer by continuing employment. The employee provides services and forgoes the right to obtain employment elsewhere as consideration for the employer's promises, while the employer enjoys the extra productivity and loyalty conferred by the job security term. When the employee already is employed under an enforceable agreement, however, the *employer* is the party that must provide new consideration in exchange for the employee's agreement to forgo the valuable right to job security. This right is vested in the sense that, once the contract giving rise to the right has been created, Pacific Bell must honor its contractual commitment. (See *Hunter v. Sparling* (1948) 87 Cal.App.2d 711, 722-725 [197 P.2d 807].)

The majority states that the general rule under California law is that once an employer determines after a reasonable time that it will terminate or modify the contract, and provides employees with reasonable notice of the change, additional consideration is not required. The majority further states that continued employment provides consideration for an effective modification of the contract, and that the so-called majority rule recognizes and applies this principle. (Maj. opn., *ante*, at pp. 14-15.) The sole authority cited for these "traditional rules," however, discusses the concept of mutuality of obligation, under which mutual promises must consist of binding obligations in order to serve as consideration for each other in a bilateral contract. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 228, at p. 236.) This section of the cited treatise does not concern modification or termination of an existing contract and expressly states that it is inapplicable to unilateral contracts. (*Id.* at p. 237.) The majority does cite another section in the same treatise regarding modification of a contract, but that section is limited to the question whether a promise that reserves a promisor's right to modify the contract defeats mutuality of obligation in a bilateral contract. (*Id.*, § 233, at pp. 240-241.) Thus, the majority incorrectly indicates that California law supports the application of the purported traditional rules to the termination

or modification of a promise of job security in an existing unilateral employment contract.[5]

The so-called minority cases recognize the analytical flaw in the majority's reasoning. For example, in *Torosyan v. Boehringer Ingelheim Pharm.* (1995) 234 Conn. 1 [662 A.2d 89, 99 (*Torosyan*), the court determined that an employee's continued work after notice of a reduction in contract benefits cannot be construed as conclusive evidence of the employee's consent to the new terms, because the employee's only choice would be to resign or to continue working, either of which would result in the loss of the benefits at issue. In addition, in *Doyle v. Holy Cross Hosp.* (1999) 186 Ill.2d 104 [237 Ill.Dec. 100, 708 N.E.2d 1140] (*Doyle*), the Illinois Supreme Court stated: "Applying 'traditional principles' of contract law, . . . we conclude in this case that the defendant's unilateral modification to the employee handbook lacked consideration and therefore is not binding on the plaintiffs. A modification of an existing contract, like a newly formed contract, requires consideration to be valid and enforceable. [Citations.] Consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them. [Citation.] . . . Because the defendant was seeking to reduce the rights enjoyed by the plaintiffs under the employee handbook, it was the defendant, and not the plaintiffs, who would properly be required to provide consideration for the modification. But in adding the disclaimer to the handbook, the defendant provided nothing of value to the plaintiffs and did not itself incur any disadvantage. In fact, the opposite occurred: the plaintiffs suffered a detriment—the loss of rights previously granted to them by the handbook—while the defendant gained a

---

[5]Like the out-of-state decisions cited above that have adopted the rule endorsed by the majority (fns. 3 & 4, *ante*), other cases cited by the majority or by Pacific Bell as supporting the rule similarly are deficient in their reasoning. (*Sadler v. Basin Elec. Power Co-op.* (N.D. 1988) 431 N.W.2d 296, 300 [relying upon a Washington decision holding that the employer is free to make changes in the *absence* of a written policy manual giving rise to contractual obligations]; *Progress Printing Co., Inc. v. Nichols* (1992) 244 Va. 337 [421 S.E.2d 428, 430-431] [containing no analysis of contract law explaining how a previous agreement could have been terminated and replaced by a new one]; *Pershern v. Fiatallis North America, Inc.* (8th Cir. 1987) 834 F.2d 136, 138-139 [deferring to district court's prediction of Minnesota law, and finding to be a question of fact whether both parties intended for a memorandum to modify a previous agreement]; *Leathem v. Research Found. of City Univ.* (S.D.N.Y. 1987) 658 F.Supp. 651, 655 [stating in dictum, without any analysis, that employment guidelines were replaced by a subsequent handbook].)

One case cited by Pacific Bell as adopting this rule did not even address the issue. (*Preston v. Claridge Hotel & Casino* (1989) 231 N.J.Super. 81 [555 A.2d 12, 15-16] [concluding that language in a subsequent handbook was insufficiently clear to modify the prior handbook]; see *Varrallo v. Hammond Inc.* (3d Cir. 1996) 94 F.3d 842, 846 & fn. 8 [citing *Preston* and observing that New Jersey courts have not decided whether one employee handbook can supersede another].)

corresponding benefit." (*Id.* at pp. 1144-1145; accord, *Pankow v. West-America Mortg. Co.* (N.D.Ill. 1990) 740 F.Supp. 1309, 1313-1314 [employee's continuing to work after attempted revocation of job security policy simply conferred a benefit upon the employer].)

Rejecting the employer's public policy argument, also advanced by Pacific Bell in the present case, that it would be undesirable to have different employees governed by different policies, and that an employer must be free to alter employment policies, the opinion in *Doyle, supra,* 708 N.E.2d 1140, further states: "Although we are aware of these potential drawbacks, we note that this is a matter of contract and see no compelling reason here to relieve the defendant of the obligations it has voluntarily incurred. Employers who choose to set forth policies in employee handbooks and manuals as an inducement to attracting and retaining a skilled and loyal work force cannot disregard those obligations at a later time, simply because the employer later perceives them to be inconvenient or burdensome." (*Id.* at p. 1147.) Indeed, in the present case Pacific Bell obtained the advantages of offering the policy in order to retain qualified managers during good economic times, when these employees otherwise might have obtained jobs elsewhere, and then chose to disregard that policy when the marketplace changed and the employees could have benefited most from the policy.

Other jurisdictions have reached the same conclusions as those reached in *Torosyan* and *Doyle,* based upon similar reasoning. (E.g., *Ex parte Amoco Fabrics and Fiber Co., supra,* 729 So.2d 336, 340-341; *Demasse v. ITT Corp.* (1999) 194 Ariz. 500 [984 P.2d 1138, 1147-1151] (*Demasse*); *Hanly v. Riverside Methodist Hosp.* (1991) 78 Ohio App.3d 73 [603 N.E.2d 1126, 1130]; *Brodie, supra,* 934 P.2d 1263, 1268; *Robinson v. Ada S. McKinley Community Services* (7th Cir. 1994) 19 F.3d 359, 363-364 [applying Illinois law].)

The majority in the present case devotes much attention to the *dissenting* opinion in *Demasse, supra,* 984 P.2d 1138. The majority, however, fails to consider the Arizona Supreme Court's persuasive response to the points made by the dissent. For example, the dissent would have found assent and consideration in the employees' continuation of their employment, and—like the *Bankey* decision—would have eschewed "strict rules of contract modification" in favor of "equity and pragmatic reason" and the employer's "legitimate expectations." (*Id.* at pp. 1157-1158, 1160 (dis. opn. of Jones, V. C. J.).) The majority in the Arizona case rejected this notion that ordinary rules of contract modification should not apply in this context. "Self-interest may certainly provide a party with a legitimate business reason to request assent to a contract change, but the law has never before permitted unilateral

change or excused non-performance of a contract on such a ground. [Citation.]" (*Id.* at p. 1150.) The majority in *Demasse* further concluded that continued employment alone is insufficient consideration for the modification, noting that "[a]ny other result brings us to an absurdity: the employer's threat to breach its promise of job security provides consideration for its rescission of that promise." (*Id.* at p. 1145.) In addition, the dissent in *Demasse*, like some of the decisions approving a right to modify the contract unilaterally, criticized the so-called minority decisions on the ground that they impose bilateral contract principles upon a unilaterally created contract relationship. (*Id.* at p. 1156 (dis. opn. of Jones, V. C. J.).) But the only means of modifying or rescinding a unilateral contract involving continuing performance is by mutual assent. The minority cases do not conclude that in this situation the relationship is transformed into a bilateral one, but rather that both parties must agree to a modification of the preexisting contract, and that the employer must furnish something to the affected employees that will serve as an adequate substitute for the valuable right to job security that the employer seeks to terminate.

Because the majority concludes that *plaintiffs* provided the necessary consideration for cancellation of the MESP by continuing their employment, it does not reach Pacific Bell's contention that it provided its own consideration by conferring increased pension benefits upon plaintiffs. As explained above, I disagree that plaintiffs' continued employment provided consideration supporting the modification. The additional pension benefits provided by Pacific Bell to plaintiffs conceivably could constitute consideration given by Pacific Bell. A question of fact also remains whether plaintiffs, by continuing to work, accepted the offer of modification accompanied by these increased pension benefits. Those issues are not encompassed by the certified question, however.

In sum, the so-called minority rule adheres more faithfully to the general contract principles governing these types of employment agreements. Our prior decisions instruct that we must apply such principles in construing and enforcing implied-in-fact employment security agreements. Therefore, *if the issue properly were before us*, I would conclude that an employer may not unilaterally modify or rescind an unconditional job security policy, lacking an express duration provision, that has become part of the employment contract, without providing additional consideration and obtaining the employee's assent.

The majority's contrary determination would undermine the efficacy of implied-in-fact employment agreements. Employer promises expressly set forth in employment manuals and handbooks, or in policy memoranda,

would not be enduring promises but rather hollow gestures that could be repudiated by an employer once they were viewed as no longer necessary or in the interest of the employer. Thus, the majority is inconsistent with the established principles set forth in *Foley, supra*, 47 Cal.3d 654, and its progeny, because the implied-in-fact employment contracts recognized in those decisions would not be governed by the law governing modification of existing contracts.

## V

The majority opinion is unsupportable in two fundamental respects: first, in purporting to decide an issue that is neither presented on this record nor encompassed by the certified question; and second, in providing an answer that conflicts with the basic precepts of controlling contract law. The majority endorses a patently unfair, indeed unconscionable, result—permitting an employer that made a promise of continuing job security to its employees in order to retain their services during a period of good job prospects, to repudiate that promise with impunity several years later when the employer determined that it was no longer in its interest to honor its earlier commitment.

I dissent.

Mosk, J., and Kennard, J., concurred.

Appellants' petition for a rehearing was denied August 16, 2000. Werdegar, J., did not participate therein. George, C. J., Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.