Filed 5/22/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WINSTON MAR, | B327665 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. |
| v. | No. 22STCV26170) |
| LAWRENCE PERKINS et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Affirmed.

Practus, Sana Swe and Andrew W. Heger for Defendants and Appellants.

Cohen Williams, Marc S. Williams and Martin J. Chrisopher Santos for Plaintiff and Respondent.

_____

SierraConstellation Partners, LLC (Sierra) and Lawrence Perkins (collectively, Sierra defendants) appeal from an order denying their motion to compel arbitration of Winston Mar's

1

action for buyout of his partnership interest.  The trial court found the Sierra defendants failed to meet their burden to establish the existence of an arbitration agreement because Mar clearly stated that he refused to sign the arbitration agreement and Sierra could terminate his employment if it objected.  On appeal, the Sierra defendants contend the trial court erred because Sierra notified Mar that his continued employment constituted assent to the arbitration agreement, and Mar continued his employment for 19 months before he left Sierra and filed this lawsuit.

The Sierra defendants are correct that where an employer modifies its employment policy to require employees to arbitrate their disputes and clearly communicates to employees that continued employment will constitute assent to an arbitration agreement, the employees will generally be bound by the agreement if they continue to work for the company.  However, where, as here, the employee promptly rejects the arbitration agreement and makes clear he or she refuses to be bound by the agreement, there is no mutual assent to arbitrate.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Mar's Complaint*

On August 12, 2022 Mar commenced this action, asserting a cause of action for buyout of his partnership interest in Sierra pursuant to Corporations Code section 16405.[1]  Mar alleged that

---

[1]    Under Corporations Code section 16405, subdivision (b)(2)(B), a partner who dissociates from a partnership "may maintain an action against the partnership or

2

in June 2015 he and the Sierra defendants entered into a general partnership "to conduct business as a national interim management and advisory firm serving middle-market companies" facing "difficult business challenges."[2]  On April 1, 2022 Mar provided the Sierra defendants with written notice of his dissociation from the partnership effective that date.  In his notice, Mar stated the Sierra defendants were required to purchase Mar's partnership interest within 120 days pursuant to Corporations Code section 16701, subdivisions (a) and (e).  The Sierra defendants did not respond to Mar's demand for payment or tender any payment for his partnership interest.  Mar sought a determination of the buyout price of his partnership interest; an order directing the Sierra defendants to pay the buyout price plus interest; costs of suit; and reasonable attorneys' fees and the fees and expenses of any appraisers and other experts.

B.    *The Sierra Defendants' Motion To Compel Arbitration*
      On November 29, 2022 the Sierra defendants filed a motion to compel arbitration.[3]  They argued Mar was an at-will employee

---

another partner" to "have the partner's interest in the partnership purchased."

[2]    Mar alleged he was a partner, which the Sierra defendants dispute.  We treat Mar as an employee for purposes of this opinion and express no opinion on the merits of his cause of action.

[3]    The Sierra defendants styled their motion as a petition to compel arbitration.  (See Code Civ. Proc., § 1281.2 [referring to a request to enforce an arbitration agreement as a "petition of a party to an arbitration agreement"].)  However, because the pleading was filed in an existing lawsuit, we treat it as a motion

3

and was bound by the arbitration agreement in Sierra's employee handbook because the handbook stated that Mar's obligation to arbitrate was an express term of his employment. Further, Mar's refusal to sign the handbook acknowledgment and standalone arbitration agreement was immaterial because Mar's continued employment with Sierra for 19 months after Sierra added the mandatory arbitration agreement to its handbook created an implied-in-fact agreement to arbitrate between the parties.[4] The Sierra defendants argued Mar's claim fell within the scope of the arbitration agreement, and he was therefore required to arbitrate in accordance with federal and state law, which strongly favored arbitration.

In support of their motion, the Sierra defendants submitted a declaration from Rebecca Waits, Sierra's chief people officer, who started working at Sierra in October 2019. Waits stated that Perkins, Sierra's chief executive officer, founded Sierra in January 2013. Mar began working at Sierra as a business

---

to compel arbitration. (See *Villareal v. LAD-T, LLC* (2022) 84 Cal.App.5th 446, 452, fn. 2 [treating petition to compel arbitration filed in existing action as motion to compel arbitration]; *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 772 ["There is an 'analytic distinction' between a motion (or petition) to compel arbitration filed within an existing action, as here, and a petition to compel arbitration that commences an independent action."].)

Further undesignated statutory references are to the Code of Civil Procedure.

[4] The Sierra defendants argued Mar worked for an additional 18 months at Sierra, but we count 19 months from the date Sierra proposed the arbitration agreement until he left Sierra.

advisor in July 2013. According to Waits, Mar is an at-will employee with the title of "Managing Director." Mar was paid a salary, and he received an annual W-2 form from Sierra until his employment ended in 2022.

In 2020 Sierra added a mandatory arbitration agreement to its employee handbook. On August 11, 2020 Waits emailed a copy of the handbook to all Sierra employees, including Mar, along with a separate arbitration agreement.[5] Waits stated in her email, "Please print out and sign the acknowledgments for the handbook, non-harassment policy and binding arbitration policy." (Boldface omitted.) Waits averred in her declaration that Mar called her "to say that he would not sign either document." On August 17 and 21 Waits sent emails requesting that employees send their signed acknowledgments to her by August 21.

On August 31 Waits emailed Mar, stating in part, "We know that you have received this Employee Handbook, and that you are aware of its terms, regardless of the fact that you have refused to sign for it. We are therefore advising you, by way of this memo, that whether or not you agree to sign the Acknowledgment of Employee Handbook, these are the rules of this Company and they do still apply to you, including the mandatory arbitration provisions. . . . [¶] We are just sending this memo to you to say that you do not have to sign the Employee Handbook. Regardless, because you have received the handbook and are aware of its terms, if indeed you elect to continue your employment with . . . us beyond today, August 31,

---

[5] Waits's August 2020 emails, including her August 31 email exchange with Mar, were attached as exhibits to Waits's declaration.

5

2020[,] you will be deemed to have accepted the terms of these policies of the Employee Handbook, including the arbitration provisions, and will be bound by and held accountable to them, regardless of the fact that you have failed to sign it, and regardless of any express objections you may have noted." Mar responded eight minutes later by email, "Again, I am not signing this handbook. And will not be bound by it. [¶] If you would like, please feel free to terminate me due to that." Mar worked at Sierra for another 19 months after receiving Waits's August 31 email.

On March 29, 2021 Waits emailed Sierra's 2021 team member handbook to employees along with a separate arbitration agreement. Mar again called Waits "shortly thereafter to reiterate his refusal to sign the Handbook acknowledgement form."

The 2021 handbook, which was attached as an exhibit to Waits's declaration, contained an arbitration agreement that provided in part, "To the maximum extent permissible under federal and state law, any controversy, dispute or claim ('Dispute(s)') between you and the Company, or its officers, directors, owners, agents or other Team Members, subsidiaries, affiliates, parent, or related entities, related in any manner to your employment or association with the Company, or termination thereof, that could have been resolved in a court of law before a judge or jury, shall be resolved by binding arbitration at the request of any party. Arbitration is the process by which a neutral third party, rather than a judge or jury, makes a binding decision relating to a Dispute. The arbitrability of any Dispute under this agreement shall be determined by application of the substantive provisions of the Federal

6

Arbitration Act (9 U.S.C. Sections 1 and 2) ('FAA').  To the extent that the FAA is inapplicable, the arbitration law of the state in which you work or last worked for the Company shall apply. Arbitration shall be the exclusive method for resolving any Dispute; provided however, that any party may request provisional relief from a court of competent jurisdiction, as provided under federal or state law.  Even if the Company does not sign or acknowledge receipt of this agreement, the Company, like you, agrees to be bound by this agreement and agrees to arbitrate all Disputes."

The 2021 handbook contained an acknowledgment page, which stated in part, "Whether or not I have signed a separate agreement to arbitrate, I understand that I have agreed that my employment with the company is subject to binding arbitration which is set forth in the 'arbitration' section of the handbook.  I understand and acknowledge that the agreement to arbitrate contains a waiver of my ability to act as a class representative in any class action proceeding or to participate in any class proceeding as a member of a class.  Arbitration provided for under this agreement is the exclusive method to resolve any disputes or controversies that the company or I may have, whether or not arising out of my employment or termination of that employment with the company."  (Capitalization omitted.) Mar did not sign the handbook acknowledgment form.

The separate arbitration agreement contained the same provisions as the arbitration agreement in the 2021 handbook, except it contained a different acknowledgment paragraph and

signature line for the employee.[6]  The acknowledgment paragraph provided, "I hereby acknowledge that I have received, reviewed, and agree to the binding arbitration agreement and the class action waiver and that I have waived my right to a trial before a judge or jury in all disputes with the company." (Capitalization omitted.)  Mar did not sign the separate arbitration agreement.

C.     *Mar's Opposition to the Motion To Compel Arbitration*

In Mar's opposition to the Sierra defendants' motion to compel arbitration, he argued that he never agreed to arbitrate his claim as evidenced by Waits's declaration.  Mar asserted that when Sierra proposed a change to its existing relationship with Mar by requiring arbitration of all disputes, he was free to reject it and make a counteroffer.  After Mar told Waits that Sierra could terminate him due to his refusal to sign the handbook acknowledgment form, Sierra never attempted to fire him.

In his supporting declaration, Mar stated that when he joined Sierra in 2013, Mar, Perkins, and Tim Hassenger agreed that they would be equal equity owners as partners in Sierra. Mar contributed $400,000 to Sierra over the years, which Sierra had not repaid.  During his time with Sierra, Mar generated tens of millions in revenue for the company through his contacts and clients, and he led numerous projects for Sierra's clients.  When Hassenger left Sierra, Perkins and Mar "agreed to split the equity 60/40 in favor of Mr. Perkins, recognizing that Mr. Perkins

---

[6]     The separate arbitration agreement was attached as an exhibit to Waits's declaration.

8

handled more management of the company. This agreement was reached orally and was never documented."

When Mar received Waits's August 11, 2020 email requesting a signed copy of the arbitration acknowledgment form, Mar "did not believe the arbitration agreement applied to [him] as a partner of [Sierra]." Mar's account of the emails he and Waits exchanged does not differ from that of Waits. Mar stated he called "Waits and informed her that [he] would not sign the handbook or arbitration agreement." Waits then stated in an August 31 email to Mar that Mar's continued employment would be deemed acceptance of the arbitration agreement. Mar replied, "Again, I am not signing this handbook. And will not be bound by it. If you would like, please feel free to terminate me due to that."

According to Mar, on March 29, 2021 Waits emailed the entire company a link to the handbook and arbitration agreement. Shortly thereafter, Mar called Waits "to make clear, again, that [he] would not be signing the arbitration agreement and that she could terminate him if she insisted on instituting such a clause. Again, nobody from [Sierra] ever attempted to terminate [his] relationship with the company." On April 1, 2022 Mar provided written notice of his intent to withdraw as a partner, and Sierra responded that it wanted Mar to continue leading several projects for the company. Mar agreed, and he signed an independent consulting agreement with Sierra on April 1, 2022, which did not contain an arbitration provision.[7] However, Mar left Sierra on April 1 because "Perkins wanted to

---

[7]     Mar attached the independent consulting agreement as an exhibit to his declaration.

change the terms [of their oral partnership agreement] to further favor his position."

D.     *The Sierra Defendants' Reply in Support of Their Motion To Compel Arbitration*

In their reply, the Sierra defendants disputed that Sierra ever had an oral partnership agreement with Mar. They argued that in response to Waits's August 2020 email, Mar did not claim the employee handbook did not apply to him as a Sierra partner, only raising the possibility that Sierra could terminate his employment. Further, Mar's independent consulting agreement with Sierra stated he was previously employed by Sierra without any mention of his partnership interest in Sierra.

E.     *The Trial Court's Ruling*

On March 10, 2023, after hearing argument from counsel, the trial court denied the Sierra defendants' motion to compel arbitration. The court explained in its minute order, "Defendants have the burden of establishing the existence of an arbitration agreement. Defendants have not met that burden. [Mar] clearly stated he did not agree to arbitration. He said Defendants could fire him for his refusal to be bound by the employee handbook's arbitration provision. Defendants did not fire him. Defendants cite no authority holding that an employee handbook creates an implied-in-fact contract despite the employee's express statement he will not be bound by it. Nor have Defendants shown that in the standoff presented here—the employer doesn't fire an employee who refuses to agree to arbitration, and the employee doesn't quit—the law deems the employee to have consented."

The Sierra defendants timely appealed.

10

## DISCUSSION

A.    *Motions To Compel Arbitration and Standard of Review*

Section 1281.2 requires the trial court to order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate such controversy . . . if it determines that an agreement to arbitrate the controversy exists."  Accordingly, the threshold question is whether there is an agreement to arbitrate. (*American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228, 233 ["arbitration is a matter of contract"]; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (U.S.), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*) [""'A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'""]; *Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1120 (*Trinity*) ["As the language of this section makes plain, the threshold question presented by every petition to compel arbitration is whether an agreement to arbitrate exists."].)

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence an agreement to arbitrate a dispute exists, and the party opposing arbitration bears the burden of proving unconscionability or other defenses. (*Pinnacle, supra*, 55 Cal.4th at p. 236; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)  "To carry this burden of persuasion the moving party must first produce 'prima facie evidence of a written agreement to arbitrate the controversy.'  [Citations.]  'If the moving party meets its initial prima facie burden and the opposing party disputes the

11

agreement, then . . . the opposing party bears the burden of producing evidence to challenge the authenticity of the agreement.' [Citations.]  If the opposing party produces such evidence, then 'the moving party must establish with admissible evidence a valid arbitration agreement between the parties.' [Citation.]  Despite the shifting burden of production, '[t]he burden of proving the agreement by a preponderance of the evidence remains with the moving party.'" (*Trinity, supra*, 78 Cal.App.5th at p. 1120; accord, *Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 165.)

Where "the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle, supra*, 55 Cal.4th at p. 236; accord, *Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126, 129 (*Diaz*); *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 380 (*Harris*).)  Because the facts regarding the arbitration agreement and communications between Waits and Mar are undisputed, we review de novo the legal question whether on the undisputed facts there was an agreement to arbitrate.

B.    *The Sierra Defendants Failed To Establish Mar's Assent to the Arbitration Agreement*

The Sierra defendants contend, relying on this court's decision in *Diaz, supra*, 34 Cal.App.5th at page 130, that Mar's conduct in continuing to work for Sierra constituted acceptance of Sierra's arbitration agreement regardless of whether he signed the agreement.  Mar responds that no implied-in-fact agreement was formed by his continued employment because he unequivocally rejected the arbitration agreement, and he never signed the agreement  We agree with Mar that the Sierra

12

defendants did not meet their burden to show an express or implied-in-fact agreement to arbitrate was formed.

"[I]t is a cardinal principle that arbitration under the FAA 'is a matter of consent, not coercion.' [Citation.]" Thus, "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" [Citations.] In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law while giving due regard to the federal policy favoring arbitration." (*Pinnacle, supra*, 55 Cal.4th at p. 236; accord, *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 943 ["'[W]hile California public policy favors arbitration, ""there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate."'"""].)

"'[T]he existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation and enforcement of contracts generally.'" (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978; accord, *Flores v. Nature's Best Distribution, LLC* (2016) 7 Cal.App.5th 1, 9 ["'California contract law applies to determine whether the parties formed a valid agreement to arbitrate.'"].) "An essential element of any contract is the consent of the parties, or mutual assent. [Citation.] Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270-271; accord, *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 777; see Civ. Code, § 1550 ["It is essential to the existence of a contract that there should be: . . . [the parties'] consent[.]"].) "'While both the Federal Arbitration Act . . . and California law favor arbitration, a party

13

is not required to arbitrate his or her claims absent consent.'" (*Fleming v. Oliphant Financial, LLC* (2023) 88 Cal.App.5th 13, 22; accord, *Costa v. Road Runner Sports, Inc.* (2022) 84 Cal.App.5th 224, 233.)

"A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement.  A signed agreement is not necessary, however, and a party's acceptance may be implied in fact [citation] or be effectuated by delegated consent."  (*Pinnacle, supra*, 55 Cal.4th at p. 236; accord, *Mendoza v. Trans Valley Transport, supra*, 75 Cal.App.5th at p. 777; *Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 591.)  "An implied contract is one, the existence and terms of which are manifested by conduct."  (Civ. Code, § 1621; accord, *Diaz, supra*, 34 Cal.App.5th at p. 130; *Craig v. Brown & Root* (2000) 84 Cal.App.4th 416, 420 (*Craig*).)

> 1.      *Sierra initially proposed an express bilateral arbitration agreement, which Mar rejected*

Where an arbitration agreement includes a signature line for the employee to acknowledge assent to the agreement, the employee's signature creates an express bilateral contract.  (See *Bleecher v. Conte* (1981) 29 Cal.3d 345, 350 ["A bilateral contract is one in which there are mutual promises given in consideration of each other.  [Citations.]  The promises of each party must be legally binding in order for them to be deemed consideration for each other."]; *Juen v. Alain Pinel Realtors, Inc., supra*, 32 Cal.App.5th at pp. 979-981 [employers did not meet their burden to show employee assented to arbitration agreement by initialing the arbitration provision].)

14

Here, both the arbitration agreement in the handbook and the separate arbitration agreement, by including a signature line for the employee, contemplated an express bilateral contract with mutual assent.  Although Sierra did not sign the arbitration agreement, the agreement provided that even if Sierra did not sign or acknowledge receipt of the agreement, it "agrees to be bound by this agreement and agrees to arbitrate all Disputes."  And the handbook acknowledgment form, which contained only a signature line for the employee to sign, stated above the employee's signature line that the employee agrees to binding arbitration.  Similarly, the separate arbitration agreement contained only a signature line for the employee to sign to acknowledge that the employee had "received, reviewed and agree[d] to the binding arbitration agreement."  (Capitalization omitted.)

Waits's initial emails in August 2020 show Sierra's intent for the parties to enter into an express bilateral contract to arbitrate.  On August 11 Waits emailed the handbook and separate arbitration agreement to Mar and requested that he sign the acknowledgments for the handbook and arbitration agreement.  On August 17 and 21 Waits again requested that Mar return the signed acknowledgments to her by August 21.  It is clear from these emails and the language of the arbitration agreement that Sierra did not initially intend to unilaterally impose an arbitration requirement as a condition of employment. (See *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1509 [employer did not unilaterally impose arbitration requirement absent employee's signature where "the handbook told employees that they must sign the arbitration agreement, implying that it was not effective until (and unless) they did so"];

15

*Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1171 ["the employee handbook's arbitration provision only placed plaintiffs on notice that they would be called upon to sign a separate binding arbitration agreement, thereby contradicting defendants' argument the provision in the handbook and subsequent performance constituted a unilateral contract of binding arbitration"].)

In response to Waits's August 11 email, Mar told Waits that he would not sign the arbitration agreement. Mar continued to refuse to sign the handbook and arbitration agreement acknowledgments notwithstanding Waits's August 17 and 21 emails requesting that all employees return their signed acknowledgments to her by August 21. Because no bilateral agreement to arbitrate was formed, the Sierra defendants did not meet their burden to show the existence of an arbitration agreement as of August 21.

2.   *Mar did not by his conduct assent to an implied-in-fact agreement to arbitrate*

"California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment." (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 11 (*Asmus*); accord, *Diaz, supra*, 34 Cal.App.5th at p. 130.) It is the performance by the employee in continuing to work for the employer that constitutes the employee's acceptance of the unilateral implied-in-fact contract. (*Harris, supra*, 248 Cal.App.4th at p. 384 [implied-in-fact agreement was formed "where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer"]; Civ. Code, § 1584.)

16

"In a unilateral contract, there is only one promisor, who is under an enforceable legal duty.  [Citation.]  The promise is given in consideration of the promisee's act or forbearance.  As to the promisee, in general, any act or forbearance, including continuing to work in response to the unilateral promise, may constitute consideration for the promise."  (*Asmus, supra*, 23 Cal.4th at p. 10; accord, *People v. Mohammed* (2008) 162 Cal.App.4th 920, 933 ["'A unilateral contract is one in which a promise is given in exchange for some act, forbearance or thing; there is only one promisor.'"].)

In *Asmus*, the parties agreed that under California law the company's employment security policy—which required the employer to reassign or retrain management employees if their jobs were eliminated—became a unilateral implied-in-fact contract when the employees accepted the policy by continuing their employment.  (*Asmus, supra*, 23 Cal.4th at p. 14.)  However, the parties disagreed as to how an employer could modify the unilateral contract after the employee accepted the contract by working for the employer.  The Supreme Court held, in response to a certified question from the Ninth Circuit under California Rules of Court, rule 29.5, that applying contract principles, "an employer may terminate a unilateral contract of indefinite duration, as long as its action occurs after a reasonable time, and is subject to prescribed or implied limitations, including reasonable notice and preservation of vested benefits."  (*Id.* at p. 18.)  Further, "[t]he facts clearly show that employees enjoyed the benefits of the [employment security policy] for a reasonable time period, and that [the company] gave its employees reasonable and ample notice of its intent to terminate the [policy]. . . . *In addition, the employees accepted the company's*

17

*modified policy by continuing to work in light of the modification.*" (*Ibid.*, italics added.)

In *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 635 (*DiGiacinto*), this court concluded in an employee's action for breach of contract against his employer that the employer had unilaterally modified a compensation term in a written employment contract by imposing a new written contract reducing the employee's pay for a lower-level position. This court explained, "[A]n at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." (*Id.* at p. 637.) The employee's continued employment after notice of the reduced compensation term (the new offer) was therefore acceptance of a new unilateral contract. (*Ibid.*)

Although *Asmus* and *DiGiacinto* did not address arbitration agreements, as we explained in *Diaz, supra*, 34 Cal.App.5th at page 130, "California law in this area is settled: when an employee continues his or her employment after notification that an agreement to arbitration is a condition of continued employment, that employee has impliedly consented to the arbitration agreement."[8] In *Diaz*, on December 2, 2016 the

---

[8]     The Supreme Court in *Asmus, supra*, 23 Cal.4th at pages 10 to 11 cited *Lang v. Burlington Northern R. Co.* (D.Minn. 1993) 835 F.Supp. 1104 as an example of a unilateral contract. In *Lang*, the federal district court, applying Minnesota law, found the employee's continued employment after he received an arbitration agreement "constituted acceptance of the offer and provided the necessary consideration to bind the parties." (*Lang*, at p. 1106.)

18

employer informed the employee of a new dispute resolution policy during an in-person meeting. (*Id.* at p. 128.) The employer added that continued employment by any employee who refused to sign the agreement would constitute acceptance of the agreement. (*Ibid.*) On December 14 the employee indicated she did not wish to sign the agreement, but at a December 19 meeting, the employer again advised the employee that "continuing to work constituted acceptance of the agreement." (*Ibid.*) After the employee filed a complaint for workplace discrimination, on December 23 the employee's attorney provided the employer a letter on behalf of the employee rejecting the arbitration agreement but indicating her intent to continue her employment. (*Ibid.*) This court found the employee impliedly assented to arbitration by her continued employment, explaining, "[The employee] maintained her employment status between December 2 and December 23, and remained an employee at the time of the hearing on this case. As a result, she was already bound by the arbitration agreement before the presentation of the letter indicating both her rejection of the agreement and her intent to remain employed." (*Id.* at p. 131.) [9]

---

[9] In his thoughtful concurrence (*post*, at p. 2, fn. 1), Justice Segal concludes that *Diaz* is not distinguishable (and is incorrect) because the employee (Erika Diaz), like Mar, promptly rejected the arbitration agreement. Citing his dissent in *Diaz, supra*, 34 Cal.App.5th at page 135 (dis. opn. of Segal, J.), Justice Segal reasons that Diaz was first told on December 19 by a company representative that her continuing to work for the company would constitute acceptance of the proposed arbitration agreement, and she quickly consulted a lawyer and rejected the agreement only one day later.

Likewise, in *Harris, supra*, 248 Cal.App.4th at page 381, the employee acknowledged his receipt of an arbitration agreement and employee handbook before he commenced his employment. The arbitration agreement provided that if an employee continued employment after the effective date of the policy, the employee "'will be deemed to have knowingly and voluntarily consented to and accepted all of the terms and conditions set forth herein without exception.'" In addition, the handbook provided "that receipt and agreement to the mandatory arbitration policy is 'an absolute prerequisite' to hiring and continued employment," and if "'an applicant fails to execute the

---

We agree that an employee's rejection of an arbitration agreement only a day after being told that continued employment meant acceptance of the agreement constitutes a prompt and sufficient rejection of the agreement such that no implied-in-fact agreement to arbitrate is formed. And certainly, it was reasonable for Diaz to consult with an attorney before being deemed to have accepted the agreement. However, the majority decision in *Diaz* was based on a different reading of the facts—that the company representative on December 2 told Diaz that her continued employment constituted acceptance of the agreement, and Diaz did not reject the agreement until 21 days later—on December 23, when she and her attorney presented the company a letter (albeit dated December 20) rejecting the agreement, a day after Diaz filed suit against the employer. (*Diaz, supra*, 34 Cal.App.5th at p. 128.)

Whether in a particular case an implied-in-fact agreement is created by the employee continuing to work for the company will need to be decided on the facts of the case. But the eight minutes here is too short a period, and in *Diaz*, the court found 21 days was too long. (*Diaz, supra*, 34 Cal.App.5th at p. 131.)

20

Agreement to Arbitrate yet begins employment, that employee will be deemed to have consented to the Agreement to Arbitrate by virtue of receipt of this Handbook.'" (*Id.* at p. 383.) The Court of Appeal concluded the employee's work for the employer constituted an implied-in-fact acceptance of the arbitration agreement, explaining, "Plaintiff was offered employment on an at-will basis under the terms of the Employee Handbook. Plaintiff unequivocally accepted the offer of employment by commencing to work for [the employer] for which he was paid. Plaintiff's commencement of performance under the Employee Handbook constituted assent to its terms." (*Id.* at pp. 383-384; see *Craig, supra*, 84 Cal.App.4th at pp. 420, 422 [employee's continued employment after receiving arbitration policy created implied-in-fact agreement to arbitrate where employee received the policy and continued to work for the employer until she was terminated four years later].)

Like *Diaz*, *Harris*, and *Craig*, Mar continued to work for Sierra after Waits made clear in her August 31, 2020 email that Mar would be bound by the arbitration agreement if he continued his employment. As discussed, Waits advised Mar that if he continued to work for Sierra beyond August 31, he "will be deemed to have accepted the terms of these policies of the Employee Handbook, including the arbitration provisions, and will be bound by and held accountable to them, regardless of the fact that [he] failed to sign it, and regardless of any express objections [he] may have noted." But unlike those cases, Mar responded immediately that he did not agree to be bound by the arbitration agreement. And unlike *Diaz, supra*, 34 Cal.App.5th at page 131, in which this court held the employee's conduct in continuing to work for her employer for 21 days after receiving

21

the arbitration agreement without repudiating the agreement (which she did the day after she filed suit against the employer), Mar promptly informed Waits within minutes after she sent her August 31 email that he refused to accept the terms of the agreement. Further, Mar made clear that Sierra could terminate him if his failure to sign the agreement was unacceptable.

We recognize that in both *Asmus, supra*, 23 Cal.4th at pages 7 to 8 and *DiGiacinto, supra*, 59 Cal.App.4th at page 632 the employees objected to the new terms of employment (loss of the employment security policy in *Asmus* and lower pay in *DiGiacinto*), yet the Supreme Court and this court concluded the employees were bound by the modified employment agreements as a result of their continued employment. (*Asmus*, at pp. 2-3; *DiGiacinto*, at p. 639.)[10] However, a key factor in those cases was that the consideration for the new implied-in-fact agreement was the ability of the employee to continue to work for the company. In *DiGiacinto*, for example, the employee's former job position was eliminated, but the employer reduced the employee's job responsibilities to "save his job," at the same time reducing

---

[10]    In *DiGiacinto, supra*, 59 Cal.App.4th at page 637 this court observed, in discussing the majority line of cases finding acceptance of a unilateral modified term of employment by the employee's continued employment, that "[p]resumably" (with respect to a breach of contract action), "it would not be legally relevant if the employee also had complained, objected, or expressed disagreement with the new offer; as long as the employee continued in employment with notice of the new terms." As discussed, we conclude in the arbitration context that an employee's prompt rejection of an arbitration agreement prevents the formation of an agreement to arbitrate, but the employer may terminate the employee.

his pay.  (*DiGiacinto*, at p. 632.)  And in *Asmus*, the employer notified its managers that as a result of market conditions it planned to discontinue its employment security policy to reduce costs, but it provided in place of the policy a generous pension program for its managers.  (*Asmus*, at pp. 7-8.)  Thus, the employees' continued employment was acceptance of the new consideration offered with the proposed modified employment terms.  (See Civ. Code, § 1584 ["Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."].)  Moreover, as other courts have observed, neither *Asmus* nor *DiGiacinto* (nor this court's decision in *Diaz*) addressed whether in the arbitration context the employee's prompt, express rejection of an arbitration agreement meant an implied-in-fact contract was not formed. (See *Mendoza v. Trans Valley Transport*, *supra*, 75 Cal.App.5th at p. 788 [noting that "'neither *Asmus* nor *DiGiacinto* . . . addressed whether an arbitration agreement *existed* between an employer and employee'"]; *Gorlach v. Sports Club Co., supra*, 209 Cal.App.4th at p. 1510 [same]; *Mitri v. Arnel Management Co., supra*, 157 Cal.App.4th at p. 1171 [same].)

Here, the Sierra defendants rely on Mar's conduct in remaining employed at Sierra as evidence of his assent to the arbitration agreement.  But we cannot imply Mar's intent to arbitrate given his explicit and immediate rejection of the arbitration agreement.  Where an employee promptly and unequivocally rejects an arbitration agreement as a modified term of employment, mutual assent to arbitrate is lacking.  If Sierra did not want Mar to continue his employment without an arbitration agreement, it had a simple remedy—to terminate him.  It did not.

23

Because Mar did not expressly or impliedly assent to arbitrate his claims, there was no arbitration agreement.

## DISPOSITION

The order is affirmed.  Mar is to recover his costs on appeal.


FEUER, J.


I concur:


MARTINEZ, P.J.


24

SEGAL, J., Concurring.

I join the majority's well-reasoned and persuasive opinion, with the exception of the majority's attempt on pages 18 to 22 to distinguish our decision in *Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126 (*Diaz*). Though the majority makes considerable effort to use words like "prompt" or "promptly" to distinguish today's decision from *Diaz*, I do not believe *Diaz* is distinguishable. What today's decision really shows is that *Diaz* is incorrect.

The majority makes two attempts to distinguish *Diaz*. First, the majority says that, unlike the plaintiff in *Diaz*, "Mar responded promptly that he did not agree to be bound by the arbitration agreement." (Maj. opn. *ante*, at p. 21.) The resort to an adverb like "promptly" obscures that there is no legal significance to the difference in the timing of the objections by the plaintiffs in the two cases. (See *Norfolk Southern Ry. Co. v. M/V Saginaw* (N.D. Ohio 2023) 667 F.Supp.3d 611, 615 ["What is promptly?"].) In *Diaz* the company told its employees at a meeting on December 2, 2016 they would have to sign an arbitration agreement and gave the employees "a copy of the agreement to review at home." (*Diaz*, *supra*, 34 Cal.App.5th at p. 128.) There was a dispute in the evidence whether the company also told the employees at the meeting that continuing to work for the company would constitute acceptance of the agreement. But the evidence, considered in the light most favorable to the plaintiff (who prevailed in the trial court), was

1

that the company did not.[1]  On December 14, 2016 (12 days after the company said she could take the agreement home) the plaintiff told the company she would not sign the arbitration agreement.  (*Diaz*, at p. 128.)  Therefore, the employer in *Diaz* (like Sierra) initially proposed a bilateral arbitration agreement, which the employee in *Diaz* (like Mar) rejected.

On December 19, 2016 company representatives met with the plaintiff in *Diaz*, who again said she would not sign the arbitration agreement.  (*Diaz*, *supra*, 34 Cal.App.5th at p. 128.)  According to the statement of one company representative (which was supported by a contemporaneous memorandum and which the trial court essentially credited (*id.* at p. 129; *id.* at p. 135 (dis. opn. of Segal, J.))), December 19, 2016 was the first time someone from the company told the plaintiff that by continuing to come to work she would be (in the company's words) "deemed for all purposes to have accepted" the agreement.  (*Id.*, at p. 129; *id.* at p. 135 (dis. opn. of Segal, J.).)  One day later, on December 20, 2016, the plaintiff in *Diaz*, through her attorney, sent a letter stating that she rejected the proposed arbitration agreement and that she would continue to come to work.  (*Diaz*, *supra*, at p. 128; *id.* at p. 135 (dis. opn. of Segal, J.).)  That's pretty prompt.

---

[1]     One company representative in *Diaz* stated in a declaration she told employees at the December 2, 2016 meeting that refusing to sign the agreement while continuing to work at the company would constitute acceptance of the agreement.  (*Diaz*, *supra*, 34 Cal.App.5th at p. 128.)  But as discussed in the next paragraph, that representative's statement was inconsistent with other evidence, including the statement of different company representative.  (*Diaz*, at p. 129; *id.* at p. 135 (dis. opn. of Segal, J.).)

2

Perhaps not "within minutes" (maj. opn. *ante*, at p. 21), but still pretty darn quick.

And in some ways quicker: The plaintiff in *Diaz*, an unsophisticated employee, wisely decided to consult with an attorney before responding to the company's request to sign the arbitration agreement and the company's deemed-to-have-accepted position, and the attorney still got the letter out in a day. I think taking a day to consult with an attorney is not an unreasonable delay and should not disqualify an employee's response as not prompt (enough). Put another way, an employer who "deems" an employee to have accepted a new arbitration policy one day after informing the employee of the policy has not provided "reasonable notice" of the policy, as required to modify the employment agreement. (See *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 16 ["an unqualified right to modify or terminate [an employment contract] is not enforceable"; the "exercise of the power is subject to limitations, such as fairness and reasonable notice"].)[2]

Second, the majority says "Mar made clear that Sierra could terminate him if his failure to sign the agreement was unacceptable" (maj. opn. *ante*, at p. 21), something the plaintiff in *Diaz* may not have done. In my view, this distinction is also one

---

[2] Even if in *Diaz* the company did notify the plaintiff at the December 2, 2016 meeting that continuing to work for the company would be deemed accepting the arbitration agreement, and the plaintiff therefore took 18 days to respond through her attorney that she rejected the agreement and would continue to work, eighteen days is still pretty prompt. Especially where the company asks its employees to take the arbitration agreement home to review.

3

without a difference. Mar's statement Sierra could fire him if he did not sign the arbitration agreement simply (admittedly, an adverb) made explicit what his other statements (and the statements by the plaintiff in *Diaz*) implied: I do not agree to arbitration, I'm still coming to work, and you'll have to fire me to get me to stop. As the majority repeatedly points out (maj. opn. *ante*, pp. 18, 20, 21), an employer always has the right to terminate the employment of at-will employees like Mar and the plaintiff in *Diaz* if they don't follow the rules (or sometimes even if they do); an employer certainly doesn't need to be reminded of that fact by an at-will employee.

From my perspective (dissenting in *Diaz* and joining this opinion), *Diaz* is not meaningfully distinguishable from this case. Yet the majority reaches a different result here than we did in *Diaz*. Which to me means today's decision leaves *Diaz* with very little, if any, legal or practical import for employers, employees, litigants, and their attorneys. Recognizing that reality, I concur in the majority's opinion.


SEGAL, J.

4